458 A.2d 956

**DAILEY'S CHEVROLET, INC., now by change of name, Dailey Enterprises, Inc., and Dave Hallman Chevrolet, Inc.**

**v.**

**WORSTER REALTIES, INC., and Vincent Worster, Appellants.**

Superior Court of Pennsylvania.

Argued April 28, 1982.

Filed March 25, 1983.

Robert C. Ward, Erie, for appellants.

William C. Sennett, Erie, for appellees.

Before CERCONE, President Judge, and BECK and MONTEMURO, JJ.

MONTEMURO, Judge:

This case was initiated in the court below with the filing of a Bill in Equity in the Court of Common Pleas of Erie County, in which the plaintiffs, Dailey Chevrolet, Inc. (herein Dailey), and its lessee, Dave Hallman Chevrolet, Inc. (herein Hallman), alleged that the defendants, Worster Realties, Inc. and Vincent Worster (collectively referred to herein as Worster), were causing immediate and irreparable injury to them through the blocking of certain real proper-

ty. The action complained of was the parking of four (4) semi-trailers by Worster along its property in such a manner as to block ingress and egress by Dailey-Hallman, to the various parcels of the Dailey-Hallman property. Following an initial hearing before the Honorable Lindley L. McClelland on the granting of a preliminary injunction, Worster agreed to "voluntarily" cease certain actions complained of "while the parties attempted to resolve their differences." Settlement efforts failed and subsequently testimony was taken by deposition, and the testimony, exhibits and trial briefs were submitted to Judge McClelland for decision. Thereafter, the court entered an Adjudication and Opinion together with a Decree Nisi in favor of Dailey-Hallman. Worster then filed exceptions to the Conclusions of Law and Decree Nisi, and the matter was argued before the court en banc, consisting of Judges McClelland, William E. Pfadt and Richard L. Mygaard. The en banc court entered an Order dismissing Worster's exceptions and directed that a Final Decree be entered in accordance with the Decree Nisi. Worster then filed this appeal from the en banc order of the court below. For the reasons which follow, we affirm.

Dailey is the owner of certain real property located in the City of Erie on the east side of State Street, bounded on the west by State Street, on the south by East 21st Street, on the east by French Street and on the north by railroad tracks of the N.Y.C. & St. L. Railroad also known as the Norfolk and Western Railroad Company, at East 19th Street. Assessment maps showing the property and identified as Exhibits "A" and "C" as attached to the original Bill in Equity in this case provide an excellent visual illustration:

EXHIBIT "A"        EXHIBIT "C"

From 1931 to 1974 Dailey operated a Chevrolet automobile and sales service agency on the property. The commercial complex occupied by Dailey was gradually expanded as more parcels (parcels 2–9 as shown on Exhibit "C") were added from 1945 to 1965. The entire parcel was leased to Hallman by lease dated July 15, 1974. It continues to be operated as a Chevrolet sales and service agency by Hallman. The 1974 lease from Dailey to Hallman contains the following specific description of the property included in the lease:

> It is the intention of the parties hereto to include in this Lease all property owned by Dailey's Chevrolet, Inc. and located in the City of Erie, Pennsylvania, on both the West and East sides of State Street, and bounded on the south by 21st Street, on the west by Peach Street, on the east by French Street and on the north by the N.Y.C. and St. L.R.R. tracks and right of way and being all of the

property in the City of Erie currently utilized by Landlord in the conduct of its motor vehicle business.

The Worster (referred to in Exhibit "A") property in question herein is a narrow strip of land running from the East 19th Street railroad tracks south to 21st Street, midway between State Street and French Street. The Worster strip of land bifurcates the Dailey-Hallman property. The Worster property is referred to in the brief filed by both sides as the "brewery-railroad" property because it is a narrow strip of land approximately 15 feet in width at its narrow portion which contains a railroad spur track line running south from the East 19th Street railroad tracks to the property formerly owned by Erie Brewing Company and now leased by Worster from the Erie County Industrial Development Authority, the record owner.

Worster acquired the brewery-railroad property as a part of the acquisition from Erie Brewing Company in 1979 of a larger piece of property immediately to the south of the Dailey-Hallman property, and separated therefrom by East 21st Street. Vincent Worster, president of Worster, testified that he was aware of the use of the brewery-railroad property by Hallman when he purchased the property in 1979. Mr. Worster stated that he discussed the use of brewery-railroad property by Dailey-Hallman with officials of Erie Brewing Company who stated "they had always allowed Dailey-Hallman to use the property."

The Dailey-Hallman testimony indicated that Dailey had used or utilized the brewery-railroad property for ingress and egress, for access to later acquired property and buildings, for parking and other miscellaneous uses from prior to 1940 until 1974. Furthermore, Dailey witnesses testified to various improvements to the brewery-railroad property including installation of flood lights; repairs to a wooden ramp on the property; construction of a wooden ramp; construction of a fence; and asphalting of a portion of the premises at street level.

In 1963, Dailey and the Erie Brewery Company executed a lease of the brewery-railroad parcel providing for annual

rental payments of $12.00 plus reversion of all leasehold improvements to the lessor at the expiration of the lease. The lease was duly executed by officials of Dailey and the Brewery and the annual rental payments continued at least until 1974, past the expiration date of the lease.

In February, 1980, Worster parked four empty semi-trailers at various locations on the brewery-railroad property with the intent and effect of preventing the use of that property by Dailey-Hallman. Mr. Worster testified that the parking of the trailers so as to block Dailey-Hallman for ingress and egress to their property and buildings was done "to get Dailey Enterprises' attention." Mr. Worster was attempting to sell the brewery-railroad property to Dailey and admitted that he knew that the parking of the semi-trailers would block access across the brewery-railroad property by Hallman.

On these facts the court below found an irrevocable license based on the permissive use granted to Dailey and the *reliance* placed upon that use in making improvements and purchasing other properties appurtenant to the brewery-railroad tract.

Worster contends that the court below erred in:

1) concluding that an irrevocable license had been established by Dailey-Hallman on the facts presented;

2) that even if an irrevocable license was proven, its legal effect was terminated by Dailey entering into a ten-year lease (beginning in 1963) of the same property;

3) assuming that the license was terminated by the lease, it could not be restored absent new action or money expended in reliance on it subsequent to the lease term, and

4) that even if the lease failed to terminate the license, Dailey's subsequent lease of the properties to Hallman did not transfer its license to use the brewery-railroad property.

Our review on this appeal involves the following considerations:

Our scope of review in equity matters is a limited one. The chancellor's finding of fact, affirmed by the court en banc, have the effect of a jury verdict and will not be reversed on appeal if adequate evidence is present to support them and they are not premised on erroneous inferences and deductions or an error of law. *Piercing Pagoda, Inc. v. Hoffner,* 465 Pa. 500, 351 A.2d 207 (1976); *Onorato v. Wissahickon Park, Inc.,* 430 Pa. 416, 244 A.2d 22 (1968). Thus, our function is not to substitute our view for the chancellor's but, rather, to determine whether a judicial mind, on due consideration of the evidence as a whole, could reasonably have reached the conclusion of the chancellor. *Aiken Industries, Inc. v. Estate of Wilson,* 477 Pa. 34, 383 A.2d 808 (1978); *Payne v. Kassab,* 468 Pa. 226, 361 A.2d 263 (1976). Nevertheless, conclusions of law or fact, being derived from nothing more than the chancellor's reasoning for underlying facts and not involving a determination of credibility of witnesses, are reviewable. *Felmlee v. Lockett,* 466 Pa. 1, 351 A.2d 273 (1976); *In Re Estate of Thomas,* 463 Pa. 284, 344 A.2d 834 (1975)

*Krosnar v. Schmidt Krosnar McNaughton,* 282 Pa.Super. 526, 534, 423 A.2d 370, 374 (1980)

■ Ordinarily a license is merely a "personal or revocable privilege to perform an act or series of acts on the land of another." *Hennebont Company v. Kroger Company,* 221 Pa.Super. 65, 69, 289 A.2d 229, 331 (1972). However, in Pennsylvania, a license will become irrevocable if the licensee expends money or labor in reliance on the permitted use.

In *Pierce v. Cleland,* 133 Pa. 189, 197–98, 19 A. 352, 353 (1890), the Supreme Court stated that an irrevocable license, "while not strictly an easement, is in the nature of one. It is really a permission or license, express or implied, to use the property of another in a particular manner, or for a particular purpose. Where this permission has led the party to whom it has been given, to treat his own property in a way in which he would not other-

wise have treated it, as by the erection or construction of permanent improvements thereon, it cannot be recalled to his detriment." See also *Bieber v. Zellner*, 421 Pa. 444, 220 A.2d 17 (1966); *Thompson v. McElarney*, 82 Pa. 174, (1876); *Messinger v. Washington Township*, 185 Pa.Super. 554, 137 A.2d 890 (1958).

*Harkins v. Zamichieli*, 266 Pa.Super. 401, 406, 405 A.2d 495, 498 (1979). The irrevocable license is premised upon equitable considerations in the application of the law of equitable estoppel, and as an adjunct to this application, it is well settled "that successors-in title take subject to an irrevocable license if they had notice of the license before purchase." *Harkins v. Zamichieli, supra*, 266 Pa.Superior at 407–408, 405 A.2d at 498; *Leininger v. Goodman*, 277 Pa. 75, 120 A. 772 (1923); *Messinger v. Washington Township, supra*.

■ The decision of the court below is adequately supported by Dailey witnesses who testified that in reliance on the uninterrupted right to use the brewery-railroad property for ingress and egress, Dailey purchased additional property adjacent to the brewery-railroad property, specifically parcels 2 through 9 as identified on Exhibit "C" to the Bill in Equity, *supra*. In continued reliance on the right to use the brewery-railroad property for access, ingress and egress, Dailey acquired parcel No. 2 in 1962 and performed extensive repairs and renovations thereto at a cost in excess of $100,000. Moreover, in continued reliance on the right to use the brewery-railroad property, Dailey acquired every parcel on French Street between the East 19th Street railroad tracks and East 21st Street, all of which property was geographically separated from the main Dailey property by the brewery-railroad property. A Dailey witness testified that the total cost of the acquisition, demolition, resurfacing and improvements to the French Street property was between $225,000 and $250,000. Also, improvements to the brewery-railroad property itself were made by Dailey as substantiated by testimony previously set forth in this opinion. Further, Mr. Worster, in his deposition testimony,

stated that he was aware of Dailey's use of the brewery-railroad property before he purchased it. He was told so by the Erie Brewing Company. On the basis of these facts we cannot say that the court below misapplied the law in finding an irrevocable license.

■ Additionally, we do not believe that the 1963 lease entered into between Dailey and the Erie Brewery Company terminated the previously established license. Worster argues that the lease superseded Dailey's rights and that subsequent expenditures made in reliance on the use were necessary to reestablish the irrevocable license. However, it was not inconsistent or contrary to the rights held under the license for Dailey to enter into a lease. A lease generally entitles a lessee to *more rights* (such as exclusive possession, see *Sparrow v. Airport Parking Co. of America*, 221 Pa.Super. 32, 289 A.2d 87 (1972)) than held as a licensee and we believe that the lease, far from terminating Dailey's irrevocable license, merely granted additional possessory powers to that which was already held. The license, which came into effect before 1963, was not extinguished.

Worster contends that *Margolin v. Pennsylvania Railroad Company*, 403 Pa. 195, 168 A.2d 320 (1961), supports his argument, *i.e.*, that the lease terminated any irrevocable license held by Dailey. In *Margolin*, the appellants argued that they held an irrevocable license to a certain piece of property, which had been torn down and for which they were seeking damages, impliedly arrising from a *written agreement*. The Supreme Court rejected the appellants' argument:

> Appellants also contend that irrespective of the written agreement of 1901, they acquired the asserted right of an irrevocable or executed license by prescription. This is equally without merit. The undisputed facts belie the existence of such a right. In addition, these parties, or their predecessor in title, stipulated and defined their rights and obligations in a writing of their own making. The rights acquired are defined in the contract. *Witman v. Stichter*, 1930, 299 Pa. 484, 149 A. 725. It just cannot

be ignored and treated as nonexistent. By its terms the parties involved are bound. The contract itself is completely inconsistent with the existence of an irrevocable license by prescription and no matter how you evaluate this situation, any existing rights must basically and fundamentally be derived therefrom.

*Margolin v. Pennsylvania Railroad Company, supra* 403 Pa. at 199, 168 A.2d at 322. Worster's argument is that *Margolin* requires us to say that the lease agreement defines Dailey's rights.

This case, however, is distinguishable. In *Margolin*, the parties' rights were created by contract and that contract served as the measuring stick to determine the bounds of those rights. The contractual parameters being set, there simply was just no room to infer from the circumstances of that case that an irrevocable license *by prescription* had been established. Since the right to use in *Margolin* was created by the contract, the subsequent permitted use pursuant thereto could not be characterized as prescriptive. In the instant case, Dailey's permitted, continuous use of the property for 30 years prior to the lease agreement, with substantial reliance on that use in effectuating expenditures, firmly established their rights. We cannot discern either an express or implied destruction of Dailey's previously held interests. Therefore, we cannot say that the lease in any way altered or extinguished Dailey's rights to use the brewery-line railroad property in the manner shown.[1]

1. It is interesting to note here that Worster purchased the property with full notice that Dailey-Hallman were "always allowed" to use the right-of-way by the previous owner and lacked any knowledge concerning the lease.

Q. (Mr. Dunn) Now prior to purchasing this property, did you become familiar with the use of the railroad track portion of the property you bought?

A. (Mr. Worster) Yes I did.

Q. And did you make an inquiry as to that use?

A. I made an inquiry of the realtor as to whether the property was leased or was not leased, or if it was being used as a matter of courtesy.

Q. Did you also make an inquiry from your counsel in buying the property as to the status of its title?

A. Yes, I inquired from you, you know, if there was a clear title, and the answer was, "Yes, there was." *There were no leases on record.* (Emphasis added)

.        .        .        .

Q. When did you become aware of the fact that the railroad property was a part of the Brewery Property?

A. From the time that we started to leave the building, because we had a right of first refusal in our lease, in October of '78.

Q. So you knew, then, from October of '78, when you first started occupying the building, that the railroad property, which is north from East 21st Street, was a part of the Brewery Property.

A. That is correct sir.

Q. And did you inspect the railroad property at all?

A. I walked across it, sir.

Q. So you were aware of the use by Hallman Chevrolet at that time?

A. That is correct sir.

Q. And were you aware of the existence, at that time, of the paved crossing across the railroad?

A. Yes sir

Q. Did you make any inquiry at Hallman Chevrolet about that use?

A. No. I did not, sir.

Q. Did you make any inquiry from Dailey, either Mr. Dailey or Dailey Enterprises, concerning their use of that property?

A. No I did not.

Q. Did you inquire of the officials of the brewery concerning the use of the property by Hallman or Dailey?

A. Yes I did, sir.

Q. And of whom did you inquire?

A. It would either have been Cliff Magenau (phonetic) or the president of the Erie Brewing, which—

MR. DUNN: It would be Mark Magenau or Cliff Bracken.

A. Okay, I'm sorry. That's correct.

Q. So you inquired of either Mr. Magenau or Mr. Bracken concerning that use by Hallman and/or Dailey?

A. Yes sir.

Q. And what did they tell you?

A. *That they had always allowed them to use the property because the only use they had for the property was to get an occasional railroad car in and out and that the Chevrolet Agency had always been very cooperative in moving cars so the railroad trains could pass over it.*

Q. Did they indicate to you for how long the Chevrolet Agency had used the property?

A. No sir.

Q. Did you know how long the Chevrolet Agency had been in existence at that location?

A. Not in specific number of years, no sir.

Q. You did know, did you not, that it had been there over a long period of time?

Further, the fact that Dailey is leasing this property to Hallman does not affect the right-of-way. Dailey still owns the property which is being operated for the same business and in substantially the same manner as under Dailey Chevrolet. Under such circumstances, Worster is estopped to deny the existence of the license and its use by Hallman pursuant to the leasing arrangement entered into with Dailey.

Affirmed.

A.  Yes sir.
(Emphasis added)
(Tr. June 13, 1980, pp. 4, 5, 16–18)