Jacqueline SHEPPARD, Plaintiff,

v.

AEROSPATIALE, AERITALIA d/b/a Aeritalia E Selenia Spa, and ATR Marketing, Defendants.

Civil Action No. 93–2900.

United States District Court, E.D. Pennsylvania.

March 19, 1996.

Eric G. Zajac, Kosseff and Chaiken, Daniel P. Hartstein, Marlton, NJ, Robert A. Kosseff, The Law Offices of Robert A. Kosseff, & Assoc., P.C., Philadelphia, PA, for Plaintiff.

K. Reed Haywood, J. Bruce McKissock, McKissock & Hoffman, P.C., Philadelphia, PA, Hugh Richard Koss, Stephen C. Johnson, Lillick & Charles, San Francisco, CA, for Defendants.

## MEMORANDUM AND ORDER

ANITA B. BRODY, District Judge.

This personal injury case was purportedly settled in March of 1995; however, the plaintiff, Jacqueline Sheppard, subsequently asserted that she had not authorized her attorney, Daniel P. Hartstein, to settle for the amount that he did. She seeks to re-open the case. A hearing was held on the question on January 23, 1996. For reasons that appear below, I find that, even if Ms. Sheppard did not authorize the settlement, she ratified it. It is therefore valid, and the case will not be reopened.

### BACKGROUND

Ms. Sheppard was an airplane flight attendant when the incident to which she attributes her injury occurred. She alleged that the service door of the airplane in which she was working on June 1, 1991, let out high-pitched squealing noises on ascent and descent. During the descent of the aircraft into Philadelphia, when Ms. Sheppard was sitting next to the service door, her ears blocked up and she subsequently found that she had permanently lost all hearing in one ear. She attributed her hearing loss to the defective design, manufacture, and/or installation of the service door by the manufacturer and she brought this suit. Most of the facts concerning the suit and the settlement are not in dispute. It is primarily the dollar amount of Mr. Hartstein's authority to settle that is contested.

On February 28, 1995, I denied the defendants' motion for summary judgment, and shortly thereafter, at a settlement conference before Magistrate Judge Diane Walsh on March 3, 1995, attorneys for the parties purportedly settled the case for $10,000. Ms. Sheppard and Mr. Hartstein had some telephone conversations on the question of settlement before the conference was held.[1] Their accounts of these conversations differ. Mr. Hartstein asserts that Ms. Sheppard authorized him to settle the case for $8,000 after he had explained to her the difficulty of prevailing at trial on the issue of liability. (Transcript of hearing of 1/23/96 ("Tr.") at 87–88.) Ms. Sheppard insists that she did not authorize settlement for less than $15,000. (Tr. at 21–22.) She testified that she thought her injuries were worth far more than that, that she had begun to distrust Mr. Hartstein and felt he had let her down, and that she agreed to settle at $15,000 only because she felt she had no alternative. (Tr. at 21–22, 29–31.)

Ms. Sheppard testified that when Mr. Hartstein called her shortly after the settlement conference and informed her that the case had been settled for $10,000, she did not voice her objection to the amount. (Tr. at 31–33.) Instead, she discussed the resolution of the workers' compensation lien against her settlement, her long-term disability claim, and Mr. Hartstein's fees, which he had agreed to reduce in a pre-settlement discussion. *Id.*

When Mr. Hartstein sent Ms. Sheppard the settlement release, she returned it unsigned. (Sheppard Exh. 1.) In her accompanying letter dated March 27, 1995, she called the offer of $10,000 "not only an insult,

---

1. Some time after the incident that is the subject of this suit, Ms. Sheppard moved from Wilmington, Delaware to Buffalo, New York. Her contact with Mr. Hartstein concerning the settlement of this case has been by telephone and letter.

but a selfish and ludicrous offer." *Id.* She stated that she would not agree to several non-monetary terms of the release, that she would consider a more reasonable offer, and that if her terms were not agreeable, she would continue to pursue her claim by whatever means she could. *Id.* Mr. Hartstein, responding in a letter dated April 17, 1995, professed himself to be bewildered, declared that he had had Ms. Sheppard's authority to settle her claim for $10,000, and stated that he would request a motion to enforce the settlement. (Sheppard Exh. 2.) He warned Ms. Sheppard that any costs expended in processing such a motion would come out of her portion of the settlement. *Id.* After that, the exchange of words heated up. Mr. Hartstein's secretary reported to him that Ms. Sheppard suggested he had said federal judges could be bought, and he wrote threatening to take legal action against her if she continued to slander him. (Sheppard Exh. 4.) There was a hiatus in their communication while Ms. Sheppard complained of Mr. Hartstein's settling without her authority to this court, the Philadelphia Bar Association, and the Attorney General of Pennsylvania, and she explored whether other attorneys would take her case. On August 11, 1995, Mr. Hartstein again wrote Ms. Sheppard, forwarding another copy of the release for her to sign, and stating he did so in response to her query as to why she had not received funds from the settlement. (Sheppard Exh. 3.)

On September 18, 1995, when my office tried to contact Mr. Hartstein and Ms. Sheppard to set up a conference and schedule a hearing on Ms. Sheppard's grievance, I learned that Mr. Hartstein had just received Ms. Sheppard's signed and notarized release and authorization to endorse the settlement check, which she had executed on September 13, 1996. Ms. Sheppard was offered the option of going ahead with the hearing and, after considering the option for some weeks and attempting to secure legal representation, she decided to pursue it *pro se.*

In explaining why she decided to sign the release on September 13, Ms. Sheppard read from Mr. Hartstein's letter of April 11, in which he stated that she could have the funds from the settlement only after she had signed the release that he had again enclosed. (Tr. at 40.) In response to my question as to what led her to sign, she responded:

I was still being threatened that they hadn't done anything at this particular time [regarding the settlement], that the cost eventually involved with such a motion [to enforce the settlement] would likely use up a good portion of [my] settlement amount—like I said, I'm only dealing with $3,000.[2]

.    .    .    .    .

And he has already made it painfully clear that [the cost of processing the motion] was coming out of [my portion of the settlement]. I'm at a point where I don't—I can't—I can't afford it.

(Tr. at 41–42.) I then asked Ms. Sheppard if that was the reason she signed, because she could not afford it, and she responded, "Exactly. I can't afford to pay anybody." (Tr. at 42.) On cross-examination by counsel for Mr. Hartstein, Ms. Sheppard testified that she had deposited the check and spent the money, but that she had not done so "until I had permission by counsel." (Tr. at 71.) She evidently had consulted counsel before cashing the check, although it does not appear that she had retained counsel.

At this point, the initial question that determines whether the case should be reopened is not whether Mr. Hartstein had authority to settle Ms. Sheppard's case for $10,000 at the time of the settlement conference, but whether her apparent ratification of his settlement by signing the release and authorization to endorse and by cashing the check was valid. Only if the ratification was invalid do we need to proceed to the question whether Mr. Hartstein exceeded the scope of his authority to settle the case for $10,000.

**2.** While the settlement amount was $10,000, much of it was taken up by the worker's compensation lien and attorney's fees, both of which had been reduced in consideration of the amount of the settlement.

## DISCUSSION

■ Neither party briefed the question of what law applies to this case, but they both relied primarily on Pennsylvania law and apparently assume that Pennsylvania law controls. State law provides the rules of decision on questions of contract law and of an attorney's authority to settle his client's action in a suit in which there are at least some state law claims. *See Tiernan v. Devoe*, 923 F.2d 1024, 1032–33 (3d Cir.1990). In deciding which state's law to apply in this diversity suit, we look to Pennsylvania's choice of law rules, *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941), which provide that the applicable law is that of the place with the most significant relationship to the parties and the transaction. *See e.g. Myers v. Commercial Union Assurance Cos.*, 506 Pa. 492, 485 A.2d 1113, 1115–16 (1984). The parties are all connected to different places. Ms. Sheppard was at the time of the incident a resident of Delaware; ATR was incorporated under the laws of Washington D.C. and had its principal offices in Virginia; Aerospatiale was incorporated and had its principal offices in France; and Aeritalia was incorporated and had its principal offices in Italy. The incident occurred in Pennsylvania, and that seems to be the only place common to the parties. There seems to be no candidate for the applicable law more likely than Pennsylvania, and I will therefore apply Pennsylvania law.

■ Generally speaking, either prior understanding or later ratification can validate a consent decree or contract. *See Restatement (Second) of Contracts*, §§ 3, 380; *Senyshyn v. Karlak*, 450 Pa. 535, 299 A.2d 294, 297 (1973); *In re Deed of Trust of Coho*, 421 Pa. 448, 219 A.2d 657, 658–59 (1966). In addition, general agency law supports the proposition that ratification will bind a principal. *See e.g. Complaint of Bankers Trust Co.*, 752 F.2d 874, 886 (3d Cir.1984) (Under Pa. law principal generally not liable for acts committed by agent outside apparent scope of his authority unless acts are subsequently ratified). "Mutual assent to a contract does not exist, however, when one of the contracting parties elicits the assent [or ratification] of the other contracting party by means of duress." *Degenhardt v. Dillon Co.*, — Pa. —, 669 A.2d 946, 950 (1996).

In this case, the evidence of ratification is compelling. Ms. Sheppard admits that she signed the release and cashed the settlement check. However, she maintains that she did so under economic duress. Mr. Hartstein had threatened her with a motion to enforce settlement if she did not sign, and had said the costs of the motion would come out of her share of the settlement. Ms. Sheppard had no money and said she signed because she "[couldn't] afford to pay anybody."

A recent Pennsylvania Supreme Court decision, *Degenhardt v. Dillon Co.*, is instructive. In *Degenhardt*, the issue was whether the appellant was entitled to judgment notwithstanding the verdict because the trial court had failed to follow the principle set forth in *Carrier v. William Penn Broadcasting Co.*, 426 Pa. 427, 233 A.2d 519 (1967), that if a party has the opportunity to consult with counsel regarding a proposed contract, that party cannot later invalidate the agreement by claiming economic duress. *Degenhardt*, 669 A.2d at 948.

■ In *Carrier*, the William Penn Broadcasting Co. ("the Company"), under pressure of a prospective suit, had executed a note payable to Paul and Maria Carrier. After judgment had been confessed on the note, the Company petitioned to open the judgment on the ground that the note was invalid because of duress. In ruling that the threat of a civil suit by the Carriers did not constitute duress, the *Carrier* court defined duress as:

[T]hat degree of restraint or danger, either actually inflicted or threatened and impending, which is sufficient in severity or apprehension to overcome the mind of a person of ordinary firmness.... The quality of firmness is assumed to exist in every person competent to contract, unless it appears that by reason of old age or other sufficient cause he is weak or infirm.

*Carrier*, 233 A.2d at 521 (citation and internal quotations omitted). The court went on to say, "Moreover, in the absence of threats of actual bodily harm there can be no duress

where the contracting party is free to consult with counsel." *Id.*

In *Degenhardt,* an individual partner in a construction project, Donald Degenhardt, had sued his corporate partner, the Dillon Company, alleging the latter had forced him under conditions of extreme economic duress to assign away most of his rights under their previous agreement. The Court noted that the Dillon company had proffered the assignment agreement at least four days before Degenhardt had signed it, "thereby giving [him] ample opportunity to consult with counsel before signing the Assignment Agreement." *Id.* at 951. The Court held the case was controlled by the Carrier principle, even though the Company's actions on the date of the final closing had "placed [Degenhardt] in an inextricable financial crisis for which counsel's advice would have provided little meaningful effectiveness." *Id.* at 949. It stated that "there can be no duress where the contracting party is free to come and go and to consult with counsel before assuming new contractual obligations." *Id.* at 951.

Ms. Sheppard contends that she did not voluntarily accept the $10,000 settlement in this case. She is not disputing that she signed the release and cashed the check, only that she was pressured into it by her attorney's threat that the cost of processing a motion to enforce the settlement would come out of share and by circumstances of economic hardship. The release was first proffered in mid-March, 1995, and Mr. Hartstein's statement that he would seek a motion to enforce if she did not sign was made about month later, in mid-April. Ms. Sheppard did not sign the release until mid-September, 1995, after she had had ample time to consult with counsel. In fact, she did consult with counsel during the intervening five months and asked counsel about cashing the check. During this time, she was in Buffalo, N.Y. and Mr. Hartstein was in Philadelphia. There was no threat of physical force, merely the pressure of economic circumstances and the possibility of having her share of the settlement amount cut even more by the costs of a motion to enforce the settlement. Under these circumstances, the law of Pennsylvania is clear that Ms. Sheppard cannot invalidate her ratification of the settlement on grounds of duress.

In *Degenhardt,* the Pennsylvania Supreme Court held that the plaintiff could not invalidate a contract on grounds of duress where he had had only four days to consult with counsel in circumstances of "an inextricable financial crisis for which counsel's advice would have provided little meaningful effectiveness." *Degenhardt,* 669 A.2d at 951, 949. Similarly, Pennsylvania law does not allow Ms. Sheppard to invalidate her ratification of the settlement agreement on grounds of duress when she had a much longer period of time to seek out counsel, and testified that she consulted counsel.

Because I have decided that, under Pennsylvania law, Ms. Sheppard cannot invalidate her ratification of the settlement agreement on grounds of duress, I do not reach the question whether Mr. Hartstein exceeded his authority when he agreed to settle Ms. Sheppard's claims for $10,000. At the hearing, I found Ms. Sheppard's testimony to be more credible than Mr. Hartstein's, but at this point it does not matter whether or not Mr. Hartstein exceeded his authority because Ms. Sheppard is bound by her ratification of the agreement.

### CONCLUSION

For reasons stated above, the settlement reached in this case is valid and the case will not be reopened.

### ORDER

AND NOW, this 19th day of March, 1996, upon consideration of the petition of Jacqueline Sheppard to re-open this case, and after a hearing on the question, it is HEREBY ORDERED that the petition is **DENIED** and the case will remain closed.