## In re GREENFIELD DRY CLEANING & LAUNDRY, INC., Debtor.

### No. 99–3591DAS.

United States Bankruptcy Court, E.D. Pennsylvania.

June 14, 2000.

636

Young K. Park, Philadelphia, PA, for Debtor.

Johanna E. Markind, Philadelphia, PA, for Rite Aid.

Frederic Baker, Ass't U.S. Trustee, Philadelphia, PA, for United States Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The most significant issue presented by the instant contested matters arising out of the Chapter 11 bankruptcy case of a single-location dry cleaning establishment is whether a "Lease Termination and License Agreement" ("the Agreement"), executed by the Debtor on November 15, 1997, was effectively terminated on December 4, 1998, prior to the Debtor's bankruptcy filing, thus rendering the Agreement non-assumable.

We answer this question in the affirmative. As a result, we must deny the Debtor's motion to, *inter alia*, assume the Agreement. This decision prompts us to also grant a pending motion by the Debtor's landlord, Rite Aid of Pennsylvania, Inc. ("Rite Aid") seeking relief from, or a determination of inapplicability of, the automatic stay in order that it can proceed with a state court action seeking to evict the Debtor from its long-time place of business.

In order to determine the parties' rights as between themselves we must also address the issue of whether the Agreement was a lease or a license. We hold that the Agreement is a license and therefore not within the scope of 11 U.S.C. § 365(d)(3, 4). However, while we find that Rite Aid is not entitled to superpriority status of its claim for post-petition payments, we do hold that it is entitled to first priority status for the amounts due under the Agreement post-petition.

### B. PROCEDURAL AND FACTUAL HISTORY

On December 22, 1999, GREENFIELD DRY CLEANING & LAUNDRY, INC.

("the Debtor"), filed the underlying voluntary bankruptcy case under Chapter 11 of the Bankruptcy Code. Pending for trial five days after the bankruptcy filing was a lawsuit brought by Rite Aid against the Debtor in the Court of Common Pleas of Philadelphia County at November Term, 1998, No. 3335 ("the State Action"), seeking possession and back rent as to the Debtor's place of business at 6101 N. Broad Street, Philadelphia, PA 19141 ("the Premises").

The State Action was commenced on November 25, 1998, by Rite Aid's taking a confessed judgment against the Debtor. The Debtor thereafter successfully petitioned to open the confessed judgment and initially requested a jury trial of the Action. However, it was ultimately listed for a "major non-jury trial" on December 27, 1999, when it was stayed by the bankruptcy filing.

There were no matters of substance filed in this case prior to our scheduling a status hearing on February 23, 2000, after which we entered an order requiring the Debtor to file a plan and proposed accompanying disclosure statement by March 31, 2000, and scheduling a hearing on the acceptability of the disclosure statement on April 26, 2000.

On March 20, 2000, Rite Aid filed one of the matters presently before us, a motion "for a Determination Under § 365 that the Debtor Has No Interest in Store Space at 6101 North Broad Street, Philadelphia, or, Alternatively, for Lifting of the Automatic Stay under § 362(b)(10); and for Superpriority Status Under § 507(a)(1) for Expenses Incurred During Pendency of the Bankruptcy Proceeding" ("the Rite Aid Motion"). A hearing on the Rite Aid Motion was initially scheduled on April 12, 2000, but was continued by agreement to April 26, 2000.

On April 6, 2000, the Debtor filed a motion to extend the time for the filing of its plan and disclosure statement ("the Extension Motion"). A hearing on the

Extension Motion was also originally scheduled on April 12, 2000, but was also thereafter continued to April 26, 2000.

On April 18, 2000, the Debtor filed the last of the matters presently before us, a motion to Assume/Affirm Lease/Sublease/License Nunc Pro Tunc ("the Assumption Motion"). We granted an application to expedite the hearing on the Assumption Motion to April 26, 2000, as well.

At the proceedings on April 26, 2000, we indicated an intention to grant the Extension Motion to allow the Debtor's filing of a plan and disclosure statement forty-five (45) days after we rendered a decision with respect to the Rite Aid Motion and the Assumption Motion. Our attached order addresses this issue.

At the hearing which followed, Rite Aid called Mark Drogalis, Esquire, its former counsel, who had negotiated the Agreement on its behalf. The only other proposed witness at the hearing was Rose McNicholas, who took the stand to testify regarding the market rental value of the Premises. However, Rite Aid chose not to present further testimony after we sustained an objection to the initial substantive question put to her.

The Debtor called no witnesses at the hearing, although we warned its counsel several times that the absence of testimony would result in no record to support the Debtor's averments regarding any factual matters in dispute, including the negotiation of the Agreement and the condition of the Premises. At the close of the hearing, the parties agreed to submit opening briefs by May 12, 2000, and reply briefs by May 19, 2000, to substantiate their respective positions in reference to the pending Motions.

The statements of facts in the parties' respective post-trial briefs indicate that the Debtor and its predecessors have occupied the Premises to operate a dry cleaning business for over thirty (30) years. The Debtor executed the most recent sublease for the Premises with 6101 N. Broad St. Associates, L.P. ("Broad"), on December 30, 1986, which provided the Debtor with options for renewals extending through November 30, 2001. The rent was set at $3,291.67 monthly in the lease's final term, subject to an annual increase determined by the percentage increase in the Consumer Price Index.

In 1997 Broad decided to sell the Premises to Rite Aid. Rite Aid conditioned the agreement of sale upon Broad's conveying the Premises to it either "free of tenants or with acceptable relocation or other alternative agreements."

In order to convert the sublease allowing the Debtor to remain on the premises until December, 2001, into an "acceptable agreement," Rite Aid offered the Debtor a place in a new shopping center ("the New Center") which it planned to build at the site of the Premises, which would include a Rite Aid Store. Broad agreed to drop the previous rent arrearages of $63,148.75 in exchange for the Debtor's agreeing to the terms and conditions of the Agreement. On December 5, 1997, the Debtor signed the Agreement.

The portions of the Agreement most pertinent to the matters before us are paragraphs 5 and 6, which provide in pertinent part as follows:

5. *License.* Provided [the Debtor] complies with all of the terms, conditions and covenants of this [Agreement], effective November 15, 1997, [Broad] hereby grants [the Debtor] a license (the "License") to occupy the Premises for the sole purpose of conducting a dry cleaning business thereat until such time as [Broad] (or [its] successor) constructs for [the Debtor's] occupancy new premises (the "New Premises") comprising approximately 2,000 square feet on the parcel of real property at which the Premises are currently located (the "License Period"). During the License Period, [the Debtor] shall pay [Broad] (or [its] successor) a License Fee of $3,600.00 per month without request

therefor plus all utility charges, real estate taxes and other ad valorem taxes attributable to the Premises upon presentation of invoice(s) therefor....[The Debtor] acknowledges that the License granted hereunder does not create or otherwise constitute a leasehold estate in the Premises, and [the Debtor] shall use and occupy the Premises after the Lease Termination Date [of November 15, 1997,] solely as a licensee. In all events, the License shall expire and [the Debtor] shall vacate the Premises upon the earlier of receipt by [the Debtor] of five (5) days written notice from [Broad] (or [its] successor) advising that [Broad] has substantially completed construction of the New Premises, or [the Debtor's] commission of a "Default" (as hereinafter defined), [added in handwriting] *provided, however, in no event later than December 4, 1998.*

6. *New Lease.* Contemporaneously with the execution of this [Agreement] [the Debtor] shall execute a new lease (the "New Lease") with [Broad] (or [its] successor) for the New Premises in the form annexed hereto as *Exhibit "A"* and incorporated herein by reference (emphasis added) ...

The clause reciting the absolute termination date on December 4, 1998, was the last portion added to the Agreement and was initialed by the Debtor. Drogalis testified that Rite Aid made the addition of a termination date to the Agreement as a condition of the sale between Broad and Rite Aid because he was concerned that the Agreement had not previously recited a specific date on which the Debtor's occupancy would end.

In order to further emphasize and confirm the December 4, 1998, termination date, Rite Aid sent a letter of December 5, 1997, to then-counsel for the Debtor, Gerald J. McConeghy, Esquire, confirming that the Debtor agreed to this termination date. McConeghy countersigned a copy of the letter on December 5, 1997.

An unexecuted draft of a New Lease for the New Premises was attached as an exhibit to the Agreement and included a five-year leased term extending through November 15, 2002, with the option of a renewal term of five years upon expiration of the initial term. However, the New Lease was never executed by the parties. Drogalis stated that Rite Aid's plan to develop the New Center was subject to change based upon an approval process which included obtaining of permits. As it developed, the New Premises was never built, allegedly due to community opposition.

Instead, the Debtor remained in the Premises. After a dispute regarding the blocking of certain doors to the Premises by Rite Aid and a roof leak to the Premises in 1998, neither of which events were developed in the record, the Debtor ceased making any payments to Rite Aid. The Debtor's counsel argued, in his post trial briefs, that certain payments were placed in escrow.

### C. DISCUSSION

1. *The Agreement Created a License for the Debtor to Use the Premises for a Specific Time Period and Not a Lease Within the Scope of 11 U.S.C. §§ 365(d)(3) and (d)(4).*

Rite Aid argues that the Agreement is subject to 11 U.S.C. § 365(d)(3, 4), which provide in pertinent part as follows:

(3) The trustee [or debtor-in-possession, like the Debtor] shall timely perform all the obligations of the debtor, except those specified in section 365(b)(2), [relating to *ipso facto* clauses, not in issue here,] arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title. The court may extend, for cause, the time for performance of any such obligation that arises within 60 days after the date of the order for relief, but the time for performance shall not be

extended beyond such 60–day period....

(4) ... in a case under any chapter of this title, if the trustee does not assume or reject an unexpired lease of nonresidential real property under which the debtor is the lessee within 60 days after the date of the order for relief, or within such additional time as the court, for cause, within such 60–day period, fixes, then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor.

The parties, in their briefing, devote considerable attention to the issue of whether the Agreement constitutes "an unexpired lease of nonresidential real property" within the scope of these Code sections. Much of this argument addressed the Debtor's contention that the Agreement is a "license" and not a "lease," and is for that reason not within the scope of § 365(d)(3, 4).

The distinction between a license and a lease, in the context of § 365(d)(3, 4), was recently discussed at length by us in *In re Historical Locust Street Development Associates*, 246 B.R. 218 (Bankr.E.D.Pa. 2000). That decision presented the question of whether a lease agreement allowing certain designated parking spaces to be set aside for the debtor's partially-residential building for a fifty-year term, during which possession could not be terminated for any reason, was a lease subject to § 365(d)(3, 4), a license, or a "residential" lease. There, we held that, "[u]nder Pennsylvania law, a lease is 'a conveyance of grant ... usually in consideration of rent or other recompense for a prescribed period,' " quoting *In re Pittsburgh Sports Associates Holding Co.*, 239 B.R. 75, 83 (Bankr. W.D.Pa.1999), quoting in turn *Morrisville Shopping Center v. Sun Ray Drug Co.*, 381 Pa. 576, 582, 112 A.2d 183, 186 (1955), while a license "is 'a personal privilege to live on land or do certain acts thereon, but not to exercise exclusive possession and enjoyment for a term specified,' " quoting

*Sparrow v. Airport Parking Co. of America*, 221 Pa.Super. 32, 39, 289 A.2d 87, 91 (1972). *Id.* at 224.

We determined that the agreement at issue in *Historical Locust* was more like a lease than a license. *Id.* at 220, 225. In so holding, we emphasized that a license generally provides a licensee with *less* rights in real estate than a lease and that the *Historical Locust* debtor, whose tenants' rights to utilize the parking spaces in issue could not be terminated, even for non-payment of its monetary obligations under the agreement, provided the debtor with *more* rights than a normal tenant. *Id.* at 225. However, we also held that the unusual aspects of that agreement, specifically its ties to residential realty in the debtor's premises, rendered "the rather narrowly-signed provisions of § 365(d)(3, 4)," relating to *nonresidential realty*, "inapplicable to it." *Id.* at 222.

The Agreement at issue, unlike the document designated as a "Lease Agreement" at issue in *Historical Locust*, reiterates that it established a "license" for the Debtor to use the Premises to operate its dry cleaning business. Thus, although the Agreement resembled a lease in that it granted exclusive possession of the Premises to the Debtor for a certain period, it included a very definite expiration date of December 4, 1998, of the Agreement in any event. The Debtor in the instant case therefore had less rights in the Premises under the Agreement than it would have had under most leases, which are usually renewable.

In addition to being designated in a fashion which expressly negated the creation of a lease, *e.g.,* as a "Lease Termination and License Agreement," the Agreement expressly limits the Debtor to use of the Premises to conduct its dry cleaning business for a finite time period. Therefore, we conclude that the Agreement is a "license." In light of this conclusion, we reject Rite Aid's contention that the Agreement is subject to "the rather

narrowly-scoped provisions of § 365(d)(3, 4)."

■ This conclusion, while important in allowing the Debtor to escape the possibly devastating impact of § 365(d)(4), *but see Historical Locust, Id.* at 225 (opining that an "immediate surrender" should not wipe out a debtor's state-law rights), and the requirements of § 365(d)(3), is hardly decisive of most of the issues before us in its favor. Like the agreement at issue in *Historical Locust, id.* at 224, the instant Agreement is, or at least was, an executory contract within the scope of 11 U.S.C. § 365. We therefore proceed to consider the Assumption Motion and the Rite Aid Motion in this light.

### 2. The Debtor Cannot Assume the Agreement Because It Terminated on December 4, 1998.

■ Any executory contract, even a license like the Agreement, is not assumable in a bankruptcy case if it has been terminated prior to the filing of the case. *See, e.g., Moody v. Amoco Oil Co.,* 734 F.2d 1200, 1214 (7th Cir.), *cert. denied,* 469 U.S. 982, 105 S.Ct. 386, 83 L.Ed.2d 321 (1984); *In re Triangle Laboratories, Inc.,* 663 F.2d 463, 467–68 (3rd Cir.1981); *In re Bacon,* 212 B.R. 66, 69–70 (Bankr.E.D.Pa. 1997); *In re Tudor Motor Lodge Associates, L.P.,* 102 B.R. 936, 948–51 (Bankr. D.N.J.1989); and 2 COLLIER ON BANKRUPTCY, ¶ 365.02[2], at 365–20 to 365–21 (15th ed. rev.1999).

The instant Agreement included several prominent provisions, quoted at pages 638–39, *supra,* indicating that, in certain conditions, it would be terminated, ending with the expressly-negotiated declaration that "in no event" would it be terminated later than December 4, 1998.

Pursuant to provisions in the Agreement other than those quoted, Rite Aid may have had grounds to take steps towards termination of the Agreement when the Debtor allegedly defaulted in September, 1998, for failure to meet its monetary obli-gations. If it did, any rights of the Debtor to obtain a New Lease in the New Premises were terminated.

However, regardless of the Debtor's commission of a default, the Agreement included a final termination date of December 4, 1998. Therefore, the Agreement terminated long before the Debtor filed the instant bankruptcy case and it attempted to assume the Agreement. Because the Agreement was terminated prior to the Debtor's filing this case, the Agreement is and was no longer assumable. Thus, the Agreement cannot be assumed by the Debtor, and its request to do so must be denied.

The Debtor makes certain arguments in seeking to avoid this result. Most poignantly, it argues that the equities favor a different result. In this regard, it argued that it has maintained its sole place of business at the Premises for over thirty years. With respect to the terms of the Agreement, it argued that the parties were of unequal bargaining power and that it was forced into signing the Agreement when Broad, the prior property owner, placed locks on the entrances to the Debtor's business.

There are two answers to these arguments. First, there is no evidence making a record of any of these circumstances. As noted in *e.g. Forward Communications Corp. v. United States,* 221 Ct.Cl. 582, 608 F.2d 485, 509–11 (1979), cited in *In re Blanchard,* 201 B.R. 108, 114 n. 1 (Bankr. E.D.Pa.1996), "evidence" not admitted into a hearing or trial record cannot be considered. There was no testimony or any other evidence whatsoever of record regarding the Debtor's relative bargaining power and Rite Aid's locking the Premises' entrances.

To the same effect is the Debtor's further allegation that it put rent payments in escrow beginning in September, 1998, for several months, amounting to approximately $40,000.00 in total. No evidence whatsoever pertaining to rental payments in escrow was admitted into the record. It

should be noted that we reiterated to the Debtor, at the hearing, that we could not consider allegations unsupported by the record. We cannot explain or excuse the Debtor's apparent misunderstanding of its evidentiary burdens. We do note that, in the resumption of the State Action which will follow, *see* pages 643–44, *infra,* the Debtor apparently would be able to present this evidence and for that reason could possibly prevail.

■■■ Secondly, to the extent that the Debtor is arguing that any terms of the Agreement are unenforceable against it due to duress, we remind the Debtor of the principles recently recited by us in *In re RBGSC Investment Corp.*, 242 B.R. 851, 857–58, *reconsidered in part on other grounds,* 244 B.R. 71 (Bankr.E.D.Pa.2000), as follows:

> As is established in *Three Rivers Motors Co. v. Ford Motor Co.*, 522 F.2d 885, 893 (3d Cir.1975), duress at execution of a contract such as is sufficient to avoid enforcement of a contractual provision against a contracting party is not established by the presence of "pressure of financial circumstances," and can be invoked only if threats of actual bodily harm are made. *See also Plechner v. Widener College, Inc.*, 569 F.2d 1250, 1260 (3d Cir.1977); *Sheppard v. Aerospatiale*, 165 F.R.D. 449, 453 (E.D.Pa. 1996); *Temp–Way Corp. v. Continental Bank*, 139 B.R. 299, 319 (E.D.Pa.), *aff'd,* 981 F.2d 1248 (3d Cir.1992); and *Degenhardt v. Dillon Co.*, 543 Pa. 146, ——–——, 669 A.2d 946, 950–51 (1996)

We also note that we stated there, *id.* at 858, that

> [a] contract must be read as a whole. *See, e.g., Western United Life Assurance Co. v. Hayden,* 64 F.3d 833, 837 (3d Cir.1995). While it is possible to strike contractual provisions which are proven to be unconscionable,
>
> > [t]he party challenging a contract provision as unconscionable generally bears the burden of proving unconscionability. *Bishop v. Washington,*

331 Pa.Super. 387, 480 A.2d 1088, 1094 (Pa.Super.1984); *see also Argo Welded Products, Inc. v. J.T. Ryerson Steel & Sons,* 528 F.Supp. 583, 592–93 (E.D.Pa.1981).

*See also In re U.S. Physicians, Inc.,* 235 B.R. 367, 374 (Bankr.E.D.Pa.1999) (a contract must be interpreted as it is written, not as one or even all parties thereto understood it).

The Debtor further argued that it was promised a New Premises in the New Center to be built by Rite Aid shortly after Rite Aid's purchase of the instant Premises. Drogalis testified that Rite Aid has never built the New Premises. The Debtor argued that it agreed to the terms of the Agreement only upon the condition that Rite Aid would make the New Premises available to it when the Agreement's term ended, and that the termination date on the Agreement should therefore not be enforceable against it in light of the absence of the New Premises.

■■■ One difficulty with this argument is that the Agreement does not on its face support the interpretation that the construction of the New Premises is a condition precedent to the absolute termination date of the Agreement of December 4, 1998. *See* pages 638–39, *supra.* The termination date in the Agreement is clear, definite, and unconditional.

> We are also compelled to observe that [g]enerally, an event mentioned in a contact will not be construed as a condition precedent unless expressly made such a condition. *American Leasing v. Morrison Co.*, 308 Pa.Super. 318, 325–27, 454 A.2d 555, 559 (1982) (citations omitted).

*West Development Group, Ltd. v. Horizon Financial, F.A.,* 405 Pa. Super 190, 199, 592 A.2d 72, 76 (1991). *See also Marsa v. Metrobank for Savings, F.S.B.,* 825 F.Supp. 658, 664 (D.N.J.1993), *aff'd,* 26 F.3d 122 (3d Cir.1994); and *Britex Waste Co. v. Nathan Schwab & Sons,* 139 Pa.Super. 474, 483–84, 12 A.2d 473, 478 (1940).

■■■ Furthermore, we note that, to the extent that Rite Aid failed to perform

its intention to make the New Premises available to the Debtor, the evidence presented supports the application of the "doctrine of frustration of purpose." That doctrine, in *Madreperla v. Williard Co.,* 606 F.Supp. 874, 878 (E.D.Pa.1985),

> is [thusly] defined in the Restatement (Second) of Contracts § 261 (1979):
>
>> "Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render performance is discharged, unless the language or the circumstances indicate the contrary."
>
> Pennsylvania law accepts the principle of frustration of purpose. *Alvino v. Carraccio,* 400 Pa. 477, 162 A.2d 358 (1960); *Greek Catholic Congregation of Olyphant v. Plummer,* 338 Pa. 373, 382, 12 A.2d 435, 439 (1940) . . . .

It appears that Rite Aid failed to make the New Premises available to the Debtor due to circumstances beyond its control. The doctrine of frustration of purpose would, in that case, excuse this performance as a condition to the effectiveness of the termination date.

We also note that the Debtor failed to present evidence regarding the significance of the absence of the New Premises to the terms of the Agreement. As we stated at pages 641–42, *supra,* factual allegations not supported by the record cannot be considered.

Finally, although certain equities support the Debtor's position, its failure to pay any rent to Rite Aid for over two years is one equitable consideration which does not. The history of the State Action suggests an attempt by the Debtor to delay the inevitable result of eviction there as long as possible. The bankruptcy filing on the eve of the State Action's trial appears to have been, for the most part, a further instrument to effect delay.

Expanding on its argument that the Agreement is a "license," the Debtor cites to certain cases supporting the notion that a license may be irrevocable if the licensee expends money or labor in reliance thereon, *e.g., Kovach v. General Telephone Co.,* 340 Pa.Super. 144, 489 A.2d 883 (Pa.Super.1985) (telephone company found to have an irrevocable license to keep telephone poles on the plaintiff's property); and *Dailey's Chevrolet, Inc. v. Worster Realties, Inc.,* 312 Pa.Super., 275, 458 A.2d 956 (1983) (plaintiff found to have an irrevocable license to use a portion of property for ingress and egress as an easement of necessity).

The Debtor also cites *Dailey, supra;* and *Hennebont Co. v. Kroger Co.,* 221 Pa.Super 65, 289 A.2d 229 (1972) (grocery store tenant found to have an easement for parking on part of a property retained by the owner), in support of an argument that Rite Aid should be estopped from enforcing the termination date against it because of the money and labor which it allegedly expended in the Premises.

However, we note that rather obvious distinctions between the instant license and those at issue in *Kovach, Dailey,* and *Hennebont.* First, here, there is, again, no evidence to support any allegations of any expenditures of either money or labor by the Debtor in reliance on remaining in the Premises. Also, the instant Agreement expressly contains a termination date, which should have discouraged the Debtor's reliance on any continued possession of the Premises. In these other cases, there were no comparable agreements, either implied or express, limiting the duration of the relevant licenses.

Therefore, we conclude that the Debtor's rights under the license Agreement at issue terminated pre-petition, and that, for that reason the Assumption Motion must be denied.

*3. Rite Aid is Entitled to Relief from the Automatic Stay to Retake Possession of the Premises.*

 In its quest for relief from the automatic stay to obtain possession of the

Premises, Rite Aid cites initially to 11 U.S.C. § 362(b)(10), which provides as follows:

> (b) The filing of a petition under section 301, ... of this title, ... does not operate as a stay—

> (10) under subsection (a) of this section, of any act by a lessor to the debtor under a lease of nonresidential real property that has terminated by the expiration of the stated term of the lease before the commencement of or during a case under this title to obtain possession of such property; ...

Since we have held that the Debtor's rights under the Agreement terminated on December 4, 1998, it appears that § 362(b)(10) may apply. However, we have also held that the Agreement is not a "lease of non residential real property," in determining whether the same phrase in §§ 365(d)(3, 4) applies, but a "license." *See* pages 639–41, *supra*. Therefore, § 362(b)(10) does not apply here.

■ Nevertheless, our decision that the Agreement terminated pre-petition thrust the Debtor into the position of seeking to maintain possession of the Premises under a contractual agreement which has terminated. In these circumstances, we conclude that Rite Aid has proven "cause" for relief from the automatic stay generally, under 11 U.S.C. § 362(d)(1). *See Bacon, supra,* 212 B.R. at 67, 70; and *Tudor Motor Lodge, supra,* 102 B.R. at 951–58.

We emphasize that our within decision merely gives Rite Aid the right to pursue the remedy of eviction in the State Action. Since 11 U.S.C. § 365(d)(4) does not apply, Rite Aid has no basis to argue that the Debtor need "immediately surrender" the Premises to it. *See also Historical Locust, supra,* 246 B.R. at 225 (we decline to read § 365(d)(4) as wiping out a debtor's state-court claims or defenses even where it does apply). We will therefore provide, in the accompanying order, that Rite Aid is confined to pursuit of possession of the Premises in the State Action, as opposed to allowing it to seek to recover payments, since its claims for pre-petition payments are subject to discharge and pursuant of its claims for post-petition payments, addressed hereafter, remains within the jurisdiction of this court.

*4. Rite Aid Is Entitled to a Priority Claim for Its Payments Due Under the Agreement But Not to a Superpriority Claim or a Right to Immediate Payment.*

■ Rite Aid argued in its brief that it is entitled to "superpriority status pursuant to 11 U.S.C. § 507(a)(1)" for all payments falling due to it under the Agreement subsequent to the time that the Debtor filed its petition on December 22, 1999, at the rate of $3600 per month. Rite Aid cited *Zagata Fabricators, Inc. v. Superior Air Products,* 893 F.2d 624, 627 (3rd Cir.1990), for the principle that the Debtor is not entitled to free "rent" of the Premises irrespective of its potential defenses to such claims. The Debtor's reply is to argue that it would be inequitable to grant Rite Aid's request for payments because Rite Aid came into court with "unclean hands."

Rite Aid is not entitled to superpriority status, which arises under 11 U.S.C. § 507(b). It is, however, entitled to a first priority claim under 11 U.S.C. §§ 507(a)(1) and 503(b)(1)(A) for rent which constitutes "the actual necessary costs of preserving the [Debtor's] estate." This distinction may represent nothing more than a misunderstanding by Rite Aid of the meaning of a "superpriority," which it may be erroneously equating with a priority under § 507(a)(1). The *Zagata* decision held only that a landlord could collect rent under an administrative claim as a first priority creditor under §§ 507(a)(1) and 503(b), but nowhere does it allow a landlord's claim for post-petition payment to rise ·to superpriority status. 893 F.2d at 627–29.

In *In re Orient River Investments, Inc.,* 112 B.R. 126, 133 (Bankr.E.D.Pa.1990), we

cited with approval the holding in *In re Dieckhaus Stationers of King of Prussia, Inc.,* 73 B.R. 969, 973, (Bankr.E.D.Pa. 1987), that a landlord's claim for rent was *not* entitled to superpriority status. We further held, in *Orient River,* that, even as to a lease to which § 365(d)(3) applies, "a landlord is not entitled to immediate payment of delinquent rents during the period between the bankruptcy filing and rejection or assumption of a lease unless it establishes that there is a likelihood that the debtor will pay all administrative claims in full." 112 B.R. at 133.

However, we did hold, in *Orient River,* that the landlord was entitled to a priority claim for the reasonable rental value for the post-petition period in which the Debtor occupied the premises. *Id.* at 130–32, 134. Our conclusion that the Agreement is not a lease eliminates the application of § 365(d)(3) with respect to Rite Aid's administrative claim on account of post-petition "rents." However, in accordance with the decision in *Orient River,* Rite Aid is not entitled to superpriority status nor is Rite Aid entitled to immediate payment of delinquent rent.

The record contains no evidence of "unclean hands" on the part of Rite Aid. *See In re New Valley Corp.,* 181 F.3d 517, 522–27 (3d Cir.1999) (addressing the considerable burdens of proving "unclean hands"). There is likewise no evidence which would support an administrative claim at any figure other than the contract price cited in the Agreement, *i.e.,* $3600 monthly. *See* pages 638–39, *supra.* We agree with Rite Aid that *Zagata* supports its administrative claim of some amount even had the Debtor proven defenses to same. And, again, no defenses were proven. Therefore, Rite Aid is granted priority status for an administrative claim of $21,600 through June, 2000, for the six months of payments due since the Debtor's filing, plus $3600 for any additional months in which the Debtor remains in the Premises.

### D. CONCLUSION

An order consistent with the conclusions reached in this Opinion will be entered.