669 A.2d 946

**Donald J. DEGENHARDT, Appellee,**

v.

**The DILLON COMPANY, an Ohio Corporation, Appellant.**

Supreme Court of Pennsylvania.

Argued March 8, 1995.

Decided Jan. 18, 1996.

Reargument Denied April 2, 1996.

C. Arthur Wilson, Jr., Eric L. Horne, Joseph M. Ramirez, Eckert, Seamans, Cherin & Mellott, Pittsburgh, for appellant.

Paul A. Manion, Manion, McDonough & Lucas, Pittsburgh, for appellee.

Before NIX, C.J., and FLAHERTY, ZAPPALA, CAPPY, CASTILLE, and MONTEMURO, JJ.

## OPINION OF THE COURT

CASTILLE, Justice.

The sole issue in this matter is whether appellant was entitled to judgment notwithstanding the verdict because the trial court failed to follow the principles set forth in *Carrier v. William Penn Broadcasting Co.*, 426 Pa. 427, 233 A.2d 519 (1967), that if a party is able to freely consult with their counsel regarding a proposed contractual agreement, such party cannot later invalidate the agreement based upon economic duress imposed by the other party to the agreement. Because the evidence amply demonstrates that appellee here was able to freely consult with counsel before executing the contract in question, that there were no threats of actual bodily harm, and that appellee did in fact consult with counsel four days prior to signing the contractual agreement, economic duress was not a valid defense to the contract at issue. Accordingly, the trial court erroneously denied appellant's motion for a judgment notwithstanding the verdict.

The evidence giving rise to the instant dispute is that in June of 1981, appellee, Donald Degenhardt, a general contractor, obtained preliminary approval to build a federally subsidized, high-rise apartment building for the elderly in Baldwin Borough, Pennsylvania ("Baldwin Towers") from the Pennsylvania Housing Finance Agency ("PHFA"). On August 31, 1981, appellee and appellant, the Dillon Company, executed a Memorandum of Agreement by which the parties agreed to serve as general partners in the project. Under the terms of the Memorandum of Agreement, each party retained a one percent equity interest in the project and the remaining 98% of the equity interest in the project was to be sold through syndication to limited partners. The syndication proceeds from the sale were to be divided equally between appellee and appellant, less certain specified deductions (e.g. closing costs and points). In addition, appellee maintained the right to manage the property or to designate a managing agent for the building.

Problems then developed between the parties. Appellant learned that appellee had been experiencing financial difficulties and had filed for personal bankruptcy under Chapter 11 earlier that year, in January of 1981. Believing that appellee's personal bankruptcy jeopardized the completion of the project and final PHFA approval, appellant threatened to withdraw from the project unless appellee surrendered to appellant the right to control the development of the project, including the selection of the project syndicator. In an attempt to allay appellant's fears, appellee signed an addendum to the Memorandum of Agreement on January 28, 1982, which, *inter alia*, gave appellant the sole and exclusive right to choose the project syndicator. Appellant then selected the National Corporation for Housing Partnerships ("NCHP") as the project syndicator.

Appellee's personal financial problems continued and relations within the partnership became even more acrimonious. On July 9, 1982, appellant's president and legal counsel met with appellee and requested that appellee assign his right to manage the property and his entire interest in the joint venture to appellant in exchange for $110,000 since appellee was still in bankruptcy.[1] Degenhardt left the meeting and contacted the law firm which represented him in his bankruptcy proceedings in order to secure his own legal counsel at the meeting. Although appellee's bankruptcy counsel was not at that time present, his partner arrived and, after consulting with appellee, informed the parties that appellee was prepared to take whatever steps were necessary to end the problems arising from the bankruptcy proceeding but appellee would still resist attempts by appellant to force him out of the project totally. Thereafter, Degenhardt's counsel sent several letters to appellant's counsel in order to notify appellant of appellee's efforts to resolve his ongoing financial problems and of appellee's intent to remain on as general partner in the

---

1. The reason appellant asserted for attempting to "buy out" appellee was that NCHP was not willing to proceed as a project syndicator with appellee as a general partner unless appellee terminated his Chapter 11 proceedings. Moreover, NCHP contended that appellee lacked the experience to manage a multi-family apartment building.

project. Appellee also indicated his awareness of appellant's previous offer to purchase appellee's interest in the project but did not expressly accept it or reject it.

On September 26, 1982, appellee and his bankruptcy counsel attended a meeting with appellant's counsel in which the parties discussed the imminent final closing proceeding on the Baldwin Towers project which was scheduled to take place on September 28, 1982. Appellant continued to insist that appellee assign his interest in the project for consideration while appellee pressed appellant to select a different project syndicator who would allow appellee to maintain the exclusive right to manage the property. Appellant's counsel, in the presence of appellee's counsel, offered appellee an alternative: either acquiesce to appellant's terms and assign over his interest in the project or appellant would pull out of the deal altogether. After the meeting, appellee and his counsel discussed the various options available to appellee including the possibility that either party might have grounds to bring legal action against the other in the event that the venture failed. Appellee then conceded to his counsel that he felt that he had no choice other than to agree to appellant's terms.

Four days later, at the PHFA closing on the development project on September 30, 1982, appellee formally accepted appellant's offer to purchase most of appellee's interest in the partnership. The parties then executed an "Assignment Agreement" by which appellee assigned most of his interest in the project to appellant including the right to manage the property. Appellee further agreed to a general release of all future claims against appellant relating to the project. By the terms of the Assignment Agreement, appellee retained the right to receive 50% of the net syndication proceeds, less a $75,000 prior advance from appellant. Appellee also signed a separate agreement with the syndicator by which appellee accepted an offer that provided employment for his wife and for himself, a rent-free apartment in Baldwin Towers, and a share of the management fees. Upon completion of the project, in 1983, appellee and his wife were employed as resident managers at Baldwin Towers.

However, on September 19, 1988, less than two weeks before the period defined by the applicable six year statute of limitations had expired, appellee filed suit against appellant, alleging, *inter alia,* that appellant breached the Memorandum of Agreement "by forcing plaintiff Degenhardt under conditions of extreme *economic coercion and duress* to sign documents purporting to take away most of Mr. Degenhardt's rights under the August 31, 1981 agreement." R.R. at 12a–13a (emphasis added). Following a January, 1992 trial, the jury returned a $1,353,000 verdict in appellee's favor.

Appellant filed timely post-trial motions seeking judgment notwithstanding the verdict or, in the alternative, a new trial arguing, *inter alia,* that because appellee had the opportunity to consult with counsel before signing the Assignment Agreement, appellee should have been precluded from claiming economic duress under the principles set forth by this Court in *Carrier v. William Penn Broadcasting Co.,* 426 Pa. 427, 233 A.2d 519 (1967). The trial court, relying on the Superior Court case of *Litten v. Jonathan Logan, Inc.,* 220 Pa.Super. 274, 286 A.2d 913 (1971), denied appellant's post-trial motions, and entered final judgment in appellee's favor.

Appellant appealed final judgment to the Superior Court again asserting, *inter alia,* that the trial court erred by not granting appellant's motion for judgment notwithstanding the verdict or for a new trial on the basis that appellee was represented by counsel during the parties negotiations and that appellee had the opportunity to freely consult with counsel prior to signing the contract and, thus, appellee could not sustain a claim of economic duress sufficient to invalidate the Assignment Agreement. The Superior Court affirmed the trial court's judgment, finding that since there existed conflicting evidence regarding appellee's representation by counsel, the trial court properly denied appellant's motion for judgment notwithstanding the verdict. Specifically, the Superior Court found that, even though appellee was represented by the same legal counsel who represented him in his bankruptcy proceeding, there was conflicting evidence as to whether such representation was limited only to that function. The Superi-

or Court also affirmed the trial court's reliance on *Litten, supra,* finding that appellant's actions on the date of the final closing placed appellee in an inextricable financial crisis for which counsel's advice would have provided little meaningful effectiveness. On this basis, the Superior Court determined that because the trial court instructed the jury that, in order for appellee's claim of economic duress to succeed, it was necessary for him to prove an absence of an immediate legal remedy, therefore the trial court's refusal to instruct the jury regarding the availability of counsel did not unduly prejudice appellant. This appeal followed.

 A judgment notwithstanding the verdict may be entered only if the movant is entitled to judgment as a matter of law and if the evidence presented at trial was such that no two reasonable minds could disagree that the verdict would be in favor of the movant. *Boettger v. Miklich,* 534 Pa. 581, 585 n. 2, 633 A.2d 1146, 1148 n. 2 (1993) (citations omitted). In determining whether a judgment notwithstanding the verdict was required, only the evidence which supports the verdict may be considered, giving the verdict winner the benefit of any doubt. *Gonzalez v. United States Steel Corp.,* 484 Pa. 277, 287, 398 A.2d 1378, 1383 (1979) (citation omitted).

 The formation of a valid contract requires the mutual assent of the contracting parties. *See Essner v. Shoemaker,* 393 Pa. 422, 425, 143 A.2d 364, 366 (1958) (citation omitted) (before preliminary negotiations ripen into contractual obligations, there must be a manifested mutual assent to terms of the bargain). Mutual assent to a contract does not exist, however, when one of the contracting parties elicits the assent of the other contracting party by means of duress. *Carrier v. William Penn Broadcasting Co.,* 426 Pa. at 431, 233 A.2d at 521. Duress has been defined as:

[T]hat degree of restraint or danger, either actually inflicted or threatened and impending, which is sufficient in severity or apprehension to overcome the mind of a person of ordinary firmness.... The quality of firmness is assumed to exist in every person competent to contract, unless it appears that by reason of old age or other sufficient cause

he is weak or infirm.... Where persons deal with each other on equal terms and at arm's length, there is a presumption that the person alleging duress possesses ordinary firmness.... Moreover, *in the absence of threats of actual bodily harm there can be no duress where the contracting party is free to consult with counsel....*

*Id.* (citations omitted) (*citing Smith v. Lenchner,* 204 Pa.Super. 500, 504, 205 A.2d 626, 628 (1964)) (emphasis added).

In *Carrier,* appellees threatened to institute legal action against appellant to enforce a claim for the payment of compensation owed to them by appellant. Under pressure of appellees' prospective suit, appellant executed a note payable to appellees in the amount of $75,000 in satisfaction of the claim. Thereafter, judgment was confessed on the note and appellant filed a petition to open the judgment claiming that the note had been executed under duress. This Court determined that since appellant had the opportunity to consult with counsel, no claim of duress could be legally sustained.

■ This case is controlled by the *Carrier* principle that, where a party has had the *opportunity* to consult with legal counsel before entering into a contract, that same party cannot later invalidate the contract by claiming economic duress.[2] Here, as in *Carrier,* appellant's agents did not subject appellee to physical force or unlawful threats. Appel-

2. Initially, we note that contrary to the Superior Court's conclusion that counsel's representation in this matter was limited to bankruptcy matters, we find that the evidence amply demonstrates that appellee's bankruptcy lawyers, Mr. Sable and his partner Mr. Lampl, provided significant legal representation with regard to the Baldwin Towers project. In particular, both Mr. Sable and Mr. Lampl represented appellee at two different meetings in which appellee's status as a general partner in the project and the closing of the Baldwin Towers project were discussed with appellant's representatives. Moreover, appellee's counsel wrote three different letters to appellant's representatives advocating, *inter alia,* appellee's position as a general partner in the project, appellee's dissatisfaction with appellant's choice of NCHP as the project syndicator and appellant's $110,000 offer to purchase appellee's interest in the project. Thus, it cannot be said that counsel's representation in this matter was limited to appellee's bankruptcy proceedings. Moreover, the issue is whether appellee had the *opportunity* to consult with counsel before entering into the Assignment Agreement. Here, appellee clearly had such an opportunity. His choice of

lee remained free to refuse to sign the Assignment Agreement and the release and to seek whatever legal redress was available to him for appellant's threatened withdrawal from the project.[3] Further, appellant essentially proffered appellee and his counsel the terms of the Assignment Agreement at least four days before appellee actually signed the Assignment Agreement, thereby giving appellee ample opportunity to consult with counsel before signing the Assignment Agreement.

▮ Appellee's counsel testified that when he and appellee left the September 26, 1982, meeting, "it was understood that the deal was going to go ahead Dillon's way." R.R. at 260a. There is no evidence to suggest that the parties reached a different agreement on the day appellee signed the Assignment Agreement.[4] The closing represented a mere formality. *See Simeone v. Simeone,* 525 Pa. 392, 404, 581 A.2d 162, 167 (1990) (no duress exists when during the time when the agreement was being discussed, the plaintiff had more than enough time to consult with independent legal counsel if she had so desired). In short, there can be no duress where the contracting party is free to come and go and to consult with counsel before assuming new contractual obli-

counsel, whether such counsel is primarily a bankruptcy or other civil practice attorney, is of no moment and provides no basis for relief in this action. If appellee feels counsel provided inadequate representation, there exist other avenues and causes of action by which a client may seek redress.

3. Appellee counters this option by suggesting that litigation would not have been "practical" at the time he signed the Assignment Agreement because he was unable to afford a lengthy legal battle. Brief for Appellee at 40–41. We expressly reject appellee's invitation to make such an exception to the *Carrier* rule as such an exception would virtually swallow the longstanding *Carrier* rule that no duress exists where the contracting party has an opportunity to consult with counsel.

4. There is evidence to suggest that appellant insisted upon appellee's assignment of his interests in the project even before the September 26, 1982, meeting. Thereby giving appellee an even greater opportunity to consult with counsel. However, we find that even this four day advance notice period was sufficient to negate a claim of duress given our determination that, under *Carrier,* even if a plaintiff is immediately and unfairly surprised by the aggressive negotiations of new contractual obligations but nonetheless is not prevented from consulting with counsel, a claim of duress cannot be sustained.

gations. *See Pziepoira v. Long,* 338 Pa. 242, 243, 12 A.2d 904 (1940).

Appellee's primary argument is that appellant's reliance on *Carrier* is misplaced because no counsel was available to him at the precise moment he signed the Assignment Agreement.[5] However, this argument ignores the purpose behind the *Carrier* rule which is to avoid the invalidation of otherwise binding contracts where they have been entered into with the advice of counsel or where a party is free to consult with counsel. A party's mere execution of a contract without counsel present at the exact moment is of little significance. Further, there is no evidence that appellee was prevented from having counsel present at the time of execution or that appellant otherwise interfered with his free will to execute the contract, the terms of which appellee knew well in advance and which he had discussed with counsel. Moreover, appellee concedes that he made no effort at the closing to contact his counsel. Indeed, appellee demonstrated that when previously faced with adversity with regard to his negotiations with appellant, he was perfectly capable of backing away from the negotiations to contact counsel and to seek counsel's immediate presence and

5. Appellee also argues that this Court should ignore the principle articulated in *Carrier* and instead adopt the Superior Court's reasoning in *Litten v. Jonathan Logan, Inc.,* 220 Pa.Super. 274, 286 A.2d 913 (1971), in which the Superior Court held that where the plaintiffs were placed in an inextricable financial crisis by defendant and were compelled to sign the contracts in question, the cases holding that there can be no duress where the contracting party is free to consult with counsel "are not here applicable" since counsel's advice could not have assisted them. *Litten,* 220 Pa.Super. at 282 n. 1, 286 A.2d at 917 n. 1. *Litten,* however, does not represent controlling authority in this Court; thus appellee's reliance on *Litten* is misplaced. *See Peoples Mortgage Co. v. Federal National Mortgage Association,* 856 F.Supp. 910, 921 (E.D.Pa. 1994) ("Given the *Litten* majority's cursory treatment of the relationship between New York and Pennsylvania law, and its failure to distinguish or even discuss *Carrier,* we do not find *Litten* to be persuasive authority"). Moreover, unlike the defendant in *Litten,* appellant here in no way contributed to, much less caused, appellee's financial difficulties since these difficulties existed independently of the development project at issue. Further, in *Litten,* plaintiff's counsel was the brother of the defendant's attorney. Here, there is no indication that appellee's counsel had divided loyalties which would give rise to a suggestion that he would not be able to protect his client's interests.

advice.[6] Appellee's own failure to seek further legal counsel at the precise moment he signed the Assignment Agreement cannot constitute a foundation for a successful claim of duress almost six years after the contract was executed.

Furthermore, appellee here should not be able to rescind the contract having reaped the benefits of the consideration agreed to for entering the contract. Appellee was induced to sign the Assignment Agreement not by economic duress caused by appellant but, by the promise of immediate economic gain. By agreeing to the Assignment Agreement, appellee retained the right to receive 50% of the syndication proceeds and a $75,000 advance, was entitled to a share of the management fees, was given a job for himself and his wife, and was provided with rent-free housing. Moreover, in doing so, appellee was able to relinquish of himself the obligations and liabilities attendant to the partnership deal.

■■ Accordingly, we reaffirm the rule of law articulated in *Carrier* that a party who has a reasonable opportunity to consult with legal counsel before entering into a contract cannot later invalidate the contract by claiming economic duress. *Simeone v. Simeone*, 525 Pa. 392, 404, 581 A.2d 162, 167 (1990); *Adams v. Adams*, 414 Pa.Super. 634, 639, 607 A.2d 1116, 1119 (1992), *alloc. denied*, 533 Pa. 617, 619 A.2d 699 (1993); *Hamilton v. Hamilton*, 404 Pa.Super. 533, 536, 591 A.2d 720, 720–721 (1991); *Worldwide Auditing Services, Inc. v. Richter*, 402 Pa.Super. 584, 593, 587 A.2d 772, 777 (1991); *see also, Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 911–912 (3d Cir.1985), *cert. denied*, 476 U.S. 1171, 106 S.Ct. 2895, 90 L.Ed.2d 982 (1986) (under Pennsylvania law, federal and state courts have regularly invoked the principle that the opportunity to consult counsel vitiates a claim of economic duress); *Peoples Mortgage Co. v. Federal National Mortgage Association*, 856 F.Supp. 910, 920–921 (E.D.Pa.1994); *Reed v. Smith-Kline Beckman Corp.*, 569 F.Supp. 672, 675 (E.D.Pa.1983)

6. For example, at the July 9, 1982, meeting, when appellant's representatives began discussing the possibility of buying out appellee's interest in the project, appellee left the meeting and telephoned the his bankruptcy lawyer for assistance. Although his counsel was unavailable, appellee was able to procure his partner's representation.

(there was no economic duress where plaintiff was represented by counsel in a related criminal proceeding and plaintiff was always free to consult with him or other counsel). We believe appellant aptly captured the essence of the *Carrier* rule when it stated:

[C]ourts have held that potentially coercive uses of economic power by contracting parties should be investigated and addressed, whenever possible, *before* a contract is made.... The opportunity to consult with legal counsel makes such investigation and action possible, hence the *Carrier* rule that a party who has had such an opportunity, but chooses to enter into the contract anyway, cannot later interpose a tardy claim of economic duress.

Reply Brief for Appellant at 6.

Accordingly, we reverse the order of the Superior Court sustaining the trial court's denial of appellant's motion for judgment notwithstanding the verdict and remand this case to the Allegheny County Court of Common Pleas for entry of judgment notwithstanding the verdict in favor of appellant.

MONTEMURO, J., who was sitting by designation, did not participate in the decision of this case.