**Robert G. DAWSON, et al., Plaintiffs,**

v.

**J.G. WENTWORTH & COMPANY, INC., et al., Defendants.**

**Civil Action No. 96–3409.**

United States District Court, E.D. Pennsylvania.

Dec. 3, 1996.

---

Henry F. Siedzikowski, Elliott Reihner Siedzikowski & Egan, P.C., Blue Bell, PA, for Plaintiffs.

Paul McDonald, Hangley Aronchick Segal & Pudlin, Philadelphia, PA, for Defendants.

## ORDER AND MEMORANDUM

KATZ, District Judge.

**AND NOW,** this 3rd day of Dec., 1996, upon consideration of defendant's Motion for Summary Judgment, and the response thereto, it is hereby **ORDERED** that the said motion is **DENIED.**

### I. *Factual Background*

This action involves the aftermath of an agreement to purchase deferred personal injury claims. The New Jersey Joint Underwriters Association ("JUA") was formed in 1983 as a state-run auto insurance company for high-risk drivers. Second Amend.Compl. ¶¶ 10–11. By 1989, the JUA was $3.5 million dollars in debt, as the number of claims exceeded the revenue available. *Id.* at ¶ 12. In March of 1990, the New Jersey Legislature passed the Fair Automobile Insurance Reform Act of 1990 ("the Act"). The Act did the following: 1) eliminated the JUA and replaced the JUA with an assigned risk plan; 2) replaced the JUA with the Market Transition Fund ("MTF") as the high risk insurance company; and 3) retired the JUA debt. N.J.Stat.Ann. § 17:33B–1 (1994) (Assembly Appropriations Committee Statement).

The Act on its own did not resolve the JUA's funding crisis, and the New Jersey Insurance Commissioner announced a twelve to eighteen month deferral of payments on settled claims. Second Amend.Compl. ¶ 13. As a result of the deferrals, personal injury claimants and law firms had to wait for a year to a year and a half for payment of

settlements, and an ongoing court battle over the state's handling of the JUA funding crisis made traditional financial sources reluctant to buy these deferred claims. *Id.* ¶ 15.

Late in 1991, Robert Dawson became aware of the financial benefits of purchasing deferred claims. Def.Mot. for Summ.Judg. Ex. A. In 1992, Dawson began to research other companies that had purchased JUA claims and the financing of those claims. *Id.* Ex. C. In the summer of 1992, Dawson approached J.W. Wentworth and Company ("Wentworth") as a possible financier for his project. *Id.* Ex. A. After some discussion, Dawson and his initial contact at Wentworth, Jim DeLaney, agreed to form a business that would purchase deferred JUA claims and that DeLaney would handle the financing for the project and that Dawson would run the day-to-day operations of purchasing the deferred claims. *Id.* Ex. B. DeLaney and Dawson agreed at the outset that they would share the profits that the business produced. *Id.* Ex. E. DeLaney convinced his partner at Wentworth, Gary Veloric, that the claims purchasing business had potential, and DeLaney and Veloric began to seek out funding sources. *Id.* Exs. I, H. DeLaney and Veloric then founded Wentworth MFC, a single purpose partnership for purchasing JUA claims; both DeLaney and Veloric contributed $250,000 of their own money to establish the partnership. *Id.* Exs. G, H. Dawson was not a partner or a shareholder in Wentworth MFC, instead, he received $60,000 per year for handling the marketing. *Id.* Exs. A, B.

Late in 1993, Dawson asked DeLaney if his wife could take over the day-to-day responsibilities of his job; he also stated that he would be available to consult on an as-needed basis. *Id.* Exs. B, A. Martha Dawson then began to work at Wentworth and received a salary of $30,000; Dawson's consulting retainer was added to her paycheck. *Id.* Exs. A, B. Upon securing the requisite funding, Wentworth MFC began to purchase deferred claims, although DeLaney had purchased some with his own funds at an earlier date. *Id.* Exs. A, G.

Wentworth MFC had a slow start in 1994, and although Dawson did some consulting,

DeLaney and Veloric hired Michael Goodman as Vice President for Marketing in March of 1994. *Id.* Ex. G. Given Wentworth MFC's financial woes, DeLaney and Veloric decided that they could no longer afford to pay Dawson, and Jim DeLaney informed Dawson of their decision in April 1994. *Id.* Exs. A, G. In May 1994, Martha Dawson received a paycheck that did not include the amount for Dawson's consulting retainer. *Id.* Ex. A. Dawson, who was experiencing financial troubles of his own, asked that his pay be restored, and after a series of conversations, the Dawsons signed a letter releasing all of their claims to the profits of Wentworth or Wentworth MFC in exchange for the payment of the balance of the $60,000 they were to receive in 1994. *Id.* Exs. A, J. Dawson claims that DeLaney promised but never delivered a simultaneous letter agreeing that Dawson would get twenty five percent of the business profits. *Id.* Ex. A.

The Dawsons filed for bankruptcy on October 21, 1994, but they did not list their potential cause of action against Wentworth as an asset of the bankruptcy estate. *Id.* Ex. L. On January 16, 1996, Dawson filed an "Amended Schedule B" with the bankruptcy court and served the Amended Schedule on the Trustee. Pl.Resp. to Mot.For Summ. Judg. Ex. 1, 2. The Dawsons' bankruptcy case was closed in May, 1996, but upon learning of this action in August 1996, the Trustee claimed that he had no record of the amendment and moved the bankruptcy court to reopen the case to allow him to administer this action for the bankruptcy estate. Def. Mot. Ex. N. Dawson and the Trustee have since filed a Second Amended Complaint alleging tort, contract, and fraudulent conveyance claims and requesting the appointment of a receiver.

Defendants now move for summary judgment and argue the following: 1) plaintiffs are judicially estopped from pursuing this suit; 2) Dawson has no standing because the Trustee is the only entity who can pursue claims on behalf of the estate; 3) Dawson relinquished any claim to the profits of Wentworth MFC due to the signed release, and his assertions with regard to prior agree-

ments and negotiations are barred by the parol evidence rule; 4) Dawson cannot claim economic duress prompted him to sign the Release, as he had the opportunity to consult with a lawyer prior to signing it; 5) the Trustee has not produced enough evidence for his claim of fraudulent transfer to stand; and 6) plaintiffs have failed to provide adequate evidence to support their claim for the appointment of a receiver.

## II. *Standard*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

When ruling on a summary judgment motion, the court must construe the evidence and any reasonable inferences drawn therefrom in favor of the non-moving party. *Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358, 361 (3d Cir.1987); *Baker v. Lukens Steel Corp.*, 793 F.2d 509, 511 (3d Cir.1986). In other words, if the evidence presented by the parties conflicts, the court must accept as true the allegations of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986).

## III. *Discussion*

### A. *Judicial Estoppel and Standing*

 Judicial estoppel is "a judge-made doctrine that seeks to prevent a litigant from asserting a position inconsistent with one that he has previously asserted in the same or in a previous proceeding." *Ryan Operations, G.P. v. Santiam–Midwest Lumber Co.*, 81 F.3d 355, 358 (3d Cir.1996).[1] Judicial estoppel is not invoked to address relatively minor inconsistencies in a plaintiff's arguments; the doctrine applies in situations in which a litigant appears to be abusing the judicial process through his inconsistent assertions. *Id.* In order to apply the doctrine of judicial estoppel in this case, this court must find that: 1) Dawson's present position is inconsistent with the position he asserted in the prior bankruptcy proceeding; and 2) Dawson has asserted the inconsistent position in bad faith. *Ryan Operations,* 81 F.3d at 361. Wentworth argues that Dawson's failure to disclose his potential claim against defendants or his interest in the profits in Wentworth MFC in the October 1994 bankruptcy proceeding and his subsequent filing of this lawsuit is a bad faith assertion of inconsistent positions. Wentworth also argues that Dawson's filing of Amended Schedule B offers further evidence of bad faith on his part, for the amended schedule listed the value of the lawsuit as "unknown," yet Dawson's complaint alleges that the suit is worth more than $100,000.

Dawson failed to include his potential lawsuit against Wentworth in his original Bankruptcy Schedule, despite the Bankruptcy Code's requirement that a debtor disclose all his assets and liabilities. 11 U.S.C. § 521(1) (1993); Def.Mot. Ex. L. Given that Dawson's financial difficulties were an integral part of the negotiations with Wentworth that are the focus of this case, Dawson's current position as a plaintiff in this action appears to be inconsistent with his initial posture as a debtor. Wentworth's judicial estoppel argument falters on the question of Dawson's bad faith, however. Although the parties may dispute the nature of Dawson's disclosure in this case, *Oneida Motor Freight v. United Jersey Bank*, 848 F.2d 414 (3d Cir.), *cert. denied*, 488 U.S. 967, 109 S.Ct. 495, 102 L.Ed.2d 532 (1988), in which a plaintiff was judicially estopped from proceeding against a bankruptcy creditor in a later proceeding, involved a total failure to disclose possible claims in the prior proceeding. Here, Dawson made some form of disclosure and served the Trustee with his amended schedule prior to the close of the bankruptcy case. *See* Def.Mot. Ex. M, Pl.Mot. Ex. 1. The Third

---

1. Federal law of judicial estoppel applies in this case, as per Judge Sarokin's analysis in *Ryan* *Operations. See* 81 F.3d at 358 n. 2.

Circuit has decided against inferring bad faith merely from the fact of nondisclosure, and this record creates enough of a question regarding Dawson's intent as to preclude the application of the extreme remedy of judicial estoppel. *See Ryan Operations,* 81 F.3d at 364–65. As a result, the court may submit the question of whether Dawson acted in bad faith with intent to manipulate or mislead the courts to the jury. *See id.* Counsel shall submit proposed jury questions that include this issue.

Wentworth argues in the alternative that even if this court will not utilize the doctrine of judicial estoppel, Dawson lacks standing and should be dismissed as a plaintiff. The issue of whether the Trustee alone has standing is tangential at best given the representation that "Mr. Dawson and the Trustee have agreed that all proceeds are to be deposited into the Bankruptcy Court and will be distributed by that Court." Pl. Response at 21.. Dawson will remain as a plaintiff in this matter.

### B. *The Release Between Dawson and Wentworth*

 Wentworth asserts that the letter Dawson signed precludes his current claim, and that Dawson cannot argue that fraud or economic duress invalidates the signed release. Wentworth also argues that Dawson's initial acceptance of the release is a ratification of its terms. Wentworth's arguments do not persuade this court to grant summary judgment.

Dawson's claim of economic duress cannot be discounted at this time. An attempt to avoid a release on the ground of economic duress will be rejected when both parties were represented by competent counsel. *See Three Rivers Motors Co. v. Ford Motor Co.,* 522 F.2d 885, 893–94 (1975). Under Pennsylvania law, in situations in which the parties deal on equal terms and at arm's length, a presumption arises that the person alleging duress possesses ordinary firmness regarding that release, and absent threats of bodily harm, a person who has been able to consult with counsel cannot later claim that the release was executed under duress. *Carrier v. William Penn Broadcasting Co.,* 426 Pa. 427, 233 A.2d 519, 521 (1967); *see also*

*Killian v. McCulloch,* 873 F.Supp. 938 (E.D.Pa.1995). In *Degenhardt v. Dillon Co.,* 543 Pa. 146, 669 A.2d 946, 952 (1996), the Pennsylvania Supreme Court stated that a reasonable opportunity to consult counsel before contracting vitiates a claim of economic duress. Despite the broad language set forth in *Degenhardt,* both parties in that case had counsel and it is unclear whether the rules set forth in *Carrier* apply if one party cannot afford counsel, which is Dawson's position here.

The present record also does not provide enough of an indication to determine other issues as a matter of law, i.e., whether Dawson can demonstrate that terms were fraudulently omitted from the contract, *Dayhoff Inc. v. H.J. Heinz Co.,* 86 F.3d 1287, 1299–1301 (3d Cir.1996), or whether Dawson's course of conduct amounted to ratification of the release. *Cf. National Auto Brokers v. Aleeda Dev. Corp.,* 243 Pa.Super. 101, 364 A.2d 470 (1976).

### C. *Fraudulent Transfer Claims and Receivership*

Wentworth claims that the Trustee's fraudulent transfer claims fail due to insufficient evidence, but whether the Trustee can demonstrate that the transaction did not confer value reasonably equivalent to the value of assets transferred to Dawson raises a genuine issue of material fact. 11 U.S.C. § 548(a)(2) (1993); Def.Mot. Ex. B; Pl.Resp. Exs. 8, 15, 16, 20, 23. As for the issue of appointing a receiver, the question is premature at this point in time.

Accordingly, summary judgment is denied.