# Cardiac Consultants P.C. v. Feinberg

C.P. of Lancaster County, no. CI-03-01499.

*Matthew J. Creme,* for plaintiff.
*Joseph P. Hofmann,* for defendant.

CULLEN, *J.,* October 22, 2004—Cardiac Consultants P.C., plaintiff, commenced this action against Halbert J. Feinberg M.D., defendant, seeking injunctive relief as well as monetary damages based upon its claim that defendant breached a restrictive covenant in his employment agreement with plaintiff. Plaintiff subsequently abandoned its request for injunctive relief and defendant elected not to pursue his counterclaim. (N.T. April 21-22, 2004, p. 6.)

The court, sitting without a jury, heard evidence submitted by both parties. At the conclusion of the trial, the court, at the request of the parties, ordered the notes of testimony transcribed and established a briefing schedule.

## FINDINGS OF FACT

Based upon its review of the evidence, and having resolved all issues of credibility, the court finds the following facts.

(1) Plaintiff, Cardiac Consultants P.C., is a professional corporation engaged in the practice of cardiology and internal medicine with offices located in Lancaster, Pennsylvania.

(2) Defendant, Halbert J. Feinberg M.D., is a physician engaged in the practice of cardiology and critical care.

(3) From January 1993, through January 31, 2003, defendant was an employee of plaintiff. Since February 1, 2003, defendant has practiced medicine under the name of Halbert Feinberg Cardiology and Critical Care with his office in Lancaster, Pennsylvania.

(4) Prior to his employment by plaintiff, defendant had practiced cardiology in New York for 12 years.

(5) In 1992, plaintiff recruited defendant to join its practice in Lancaster, Pennsylvania.

(6) Plaintiff and defendant entered into a physician's employment agreement on September 25, 1992, which established the terms and conditions of defendant's employment by plaintiff effective January 1, 1993. (Joint exhibit 1, tab 1.) (Hereafter JX followed by tab number.)

(7) Plaintiff and defendant entered into successive physician's employment agreements in 1994, 1995 and 1996. (JX 1.)

(8) In 1996, plaintiff and defendant entered into an addendum to physician's employment agreement which addressed the matter of compensation only. (JX 2.)

(9) The final employment agreement, a professional employment agreement, was entered into between plaintiff and defendant in 1997. (JX 3.)

(10) While defendant was employed by plaintiff, defendant received additional training or certification in

left heart catheterization, transesophageal echo, permanent pacemaker insertion and licensure in cardiac nuclear imaging.

(11) The 1993 agreement established defendant's gross compensation for the year 1993 as $140,000 and established certain other employment related benefits.

(12) The 1993 agreement also established a formula for determining defendant's compensation for 1994 and established a minimum annual salary of $180,000 for 1994.

(13) The 1993 agreement, the 1994 agreement, the 1995 agreement, the 1996 agreement, the 1996 addendum, and the 1997 agreement defined "Net receipts" as gross receipts for medical services less reasonable operating expenses, including but not limited to rents, utility costs, supplies, non-physician employee payroll and taxes, insurance, and any expenses of a like nature which were reasonable and necessary for plaintiff in the operation of its business.

(14) The 1993 agreement, the 1994 agreement, the 1995 agreement, and the 1996 agreement defined "Share of net receipts" according to the number of physicians employed by plaintiff, *i.e.,* if there were six physicians, a share was one-sixth of net receipts, if there were seven physicians, a share was one-seventh of net receipts, and if there were eight physicians, a share was one-eighth of net receipts.

(15) The 1996 addendum and the 1997 agreement defined "Share of net receipts" as 75 percent of the net receipts multiplied by an "Employee share factor." The employee share factor was a percentage determined by the number of physicians employed by plaintiff.

(16) For the 1996 addendum and the 1997 agreement, the employee share factor was 14.29 percent.

(17) The formula for compensation established in the 1993 agreement for defendant's 1994 compensation was 50 percent of a share of net receipts plus an amount determined by multiplying the remaining 50 percent of net receipts by a fraction, the numerator of which was the dollar amount of medical fees generated by defendant and the denominator of which was the total dollar amount of medical fees generated by plaintiff as a whole.

(18) The 1993 agreement included an agreement between the parties to enter into successive agreements for 1995 and 1996 and established formulas for defendant's compensation for those years similar to the formula established for 1993.

(19) The 1993 agreement included a restrictive covenant pursuant to which defendant agreed not to engage in competition with plaintiff in the practice of cardiology and/or internal medicine in Lancaster County, Pennsylvania, for a period of two years after the termination of his employment with plaintiff.

(20) The 1993 agreement provided that upon defendant's completion of four years of employment with plaintiff from January 1, 1993, defendant would have the right to become a shareholder in plaintiff by the purchase of shares of plaintiff's stock at a nominal price and the execution of a shareholder's agreement then in effect by and among plaintiff and its shareholders.

(21) The 1994 agreement provided that defendant's compensation for 1994 would be no less than $180,000 and would be determined according to the same formula established in the 1993 agreements.

(22) The 1994 agreement contained the same restrictive covenant language and the same language entitling defendant to become a shareholder in plaintiff as existed in the 1993 agreement.

(23) The 1995 agreement provided for defendant's compensation for 1995 to be no less than $220,000 and to be calculated according to a new formula, that is 75 percent of a share of net receipts, which share consisted of either one-seventh or one-eighth of 50 percent of net receipts plus an amount determined by multiplying the remaining 50 percent of new receipts by a fraction, the numerator of which was the dollar amount of fees generated by defendant, and the denominator of which was the total dollar amount of medical fees generated by plaintiff as a whole.

(24) The 1995 agreement contained the same restrictive covenant language and the same language entitling defendant to become a shareholder in plaintiff as existed in the 1993 and 1994 agreements.

(25) The 1996 agreement provided for defendant's compensation for 1996 to be calculated according to a new formula, that is 100 percent of a share of net receipts, which share consisted of either one-seventh or one-eighth of 50 percent of net receipts plus an amount determined by multiplying the remaining 50 percent of net receipts by a fraction, the numerator of which was the dollar amount of medical fees generated by defendant, and the denominator of which was the total dollar amount of medical fees generated by plaintiff as a whole.

(26) The 1996 agreement contained the same restrictive covenant language and the same language entitling defendant to become a shareholder in plaintiff as existed in the 1993, 1994 and 1995 agreements.

(27) The 1996 addendum revised the formula for calculation of defendant's compensation for 1996 to be 100 percent of a share of net receipts, which share of net receipts was determined by multiplying 75 percent of net receipts by the applicable employee share factor plus an amount determined by multiplying the remaining 25 percent of net receipts by a fraction, the numerator of which was the dollar amount of medical fees generated by defendant and the denominator of which was the total dollar amount of medical fees generated by plaintiff as a whole.

(28) On January 8, 1997, plaintiff, pursuant to the terms of the 1993, 1994, 1995 and 1996 agreements, offered defendant the opportunity to become a shareholder, provided he would sign a joinder to shareholder's agreement and a new professional employment agreement. (JX 22.)

(29) Plaintiff's offer to defendant to sign the joinder to shareholder's agreement and new professional employment agreement expired February 16, 1997.

(30) Defendant objected to the proffered documents because of a 1994 addendum to the shareholder's agreement of which he was previously unaware. (JX 31.)

(31) Defendant also objected to the inclusion in the proposed professional employment agreement of a severance pay provision which had not previously been discussed with defendant, and which defendant believed was contrary to what had been represented to him at the time of his decision to accept employment with plaintiff. (JX 30.)

(32) Defendant also objected to the inclusion in the professional employment agreement of a provision that

plaintiff could not terminate the agreement except for cause if the employee had completed more than 10 years of employment. (JX 30.)

(33) Defendant refused to sign the proffered documents and attempted to negotiate certain changes with plaintiff.

(34) Plaintiff, through its president, Surender Singh M.D., refused to discuss the issues raised by defendant or to make any changes in the documents.

(35) Defendant never signed the joinder to shareholder's agreement and never became a shareholder in plaintiff.

(36) Defendant did not sign the professional employment agreement offered to him in January, 1997. (JX 30.)

(37) Following his refusal to sign the 1997 professional employment agreement, defendant continued to be employed by plaintiff without any changes in the terms of his employment.

(38) In response to defendant's refusal to sign the joinder to shareholder's agreement and the professional employment agreement, plaintiff prepared a revised professional employment agreement which deleted the severance pay provision as well as the provision dealing with defendant's option to become a shareholder in plaintiff which had appeared in the four prior agreements. (JX 3.)

(39) Plaintiff's president, Dr. Singh, instructed Gary Holsopple, plaintiff's practice administrator, to obtain defendant's signature on the joinder to shareholder's agreement and the 1997 professional employment agreement or on the revised 1997 professional employment agreement.

(40) In April or May 1997, Mr. Holsopple approached defendant and told him that plaintiff had been unable to bill for his services in 1997 because there was no employment agreement between plaintiff and defendant.

(41) Mr. Holsopple presented defendant with the revised 1997 professional employment agreement, which defendant had not seen previously, and indicated that if defendant did not sign the agreement he would not receive his next scheduled paycheck from plaintiff.

(42) Defendant signed the revised 1997 professional employment agreement on the occasion in April or May 1997, when it was presented to him by Mr. Holsopple.

(43) The formula for defendant's compensation in the 1997 agreement was the same as had been present in the 1996 addendum.

(44) The 1997 agreement contained the same restrictive covenant language as existed in the 1993, 1994, 1995 and 1996 agreements.

(45) The 1997 agreement provided that if any legal action is necessary to enforce or interpret the terms of the 1997 agreement, the prevailing party shall be entitled to reasonable attorney's fees, costs and necessary disbursements.

(46) Michael G. Lesko D.O. was offered shareholder participation at the same time as defendant. Dr. Lesko accepted the offer and executed the joinder to shareholder's agreement (JX 4) and the 1997 professional employment agreement (JX 30).

(47) Defendant continued as an employee of plaintiff during 1997, 1998, 1999, 2000, 2001 and 2002 pursuant to the terms of the 1997 agreement.

(48) Plaintiff and defendant did not sign any further employment agreements after the 1997 agreement.

(49) On or about November 1, 2002, defendant submitted a letter of resignation of his employment to plaintiff effective January 31, 2003. (JX 5.)

(50) Physicians Alliance Ltd. (PAL) is a multispeciality group of physicians.

(51) PAL is a corporation approximately 60 percent of which is owned by its member physicians and the remainder is owned by Health Management Associates (HMA).

(52) HMA owns approximately 50 hospitals in the United States with three in Pennsylvania including Lancaster Regional Medical Center.

(53) HMA also owns Central Penn Management Group (CPMG), which provides practice management services including billing, accounting, human resources and consultation to about 150 physicians in Central Pennsylvania.

(54) The largest group of physicians to which CPMG provides services is PAL.

(55) PAL was formed in the mid 1990s by a group of primary care physicians in Lancaster County in response to certain economic changes affecting the practice of medicine.

(56) Each medical practice in PAL is run independently and is its own cost center. Practice management services, purchasing, and negotiating contracts are handled through the organization.

(57) LGMG, the other large group of physicians in Lancaster County, is affiliated with Lancaster General Hospital.

(58) When PAL grew to include specialists, two of its priorities were adding orthopedics and cardiology.

(59) PAL sought to include cardiology among its services due to economic issues presented by the largest cardiology practice in Lancaster playing one hospital against the other, the need to support Lancaster Regional Medical Center, the ability to support the other physicians in PAL, especially the cardiovascular surgeons, and for the best interest of the physicians' patients.

(60) HMA conducted an analysis using an independent national company and determined that there was a need for additional cardiologists in Lancaster County.

(61) During 2001 and 2002, PAL approached plaintiff with a proposal that plaintiff become a practice in PAL.

(62) It was understood by plaintiff, defendant and PAL that PAL intended to add a cardiology specialty either by the addition of a local practice or physician or by recruiting a physician from outside the Lancaster area.

(63) Cardiologists obtain patient referrals from primary care physicians or from hospital emergency rooms.

(64) Part of PAL's proposal to plaintiff was that cardiac patients who did not already have an established relationship with a cardiologist or who did not otherwise express a physician preference would be referred by PAL physicians to plaintiff.

(65) As part of PAL's proposal, plaintiff would sell the assets of the practice to Professional Healthcare Group (PHG), a PAL affiliate which owns the assets of the PAL practices, in exchange for shares of stock. Each physician who is a shareholder has an equal amount of stock and an equal vote in the organization.

(66) PAL is a professional corporation for the physicians who are its employees.

(67) PHG is a service corporation which serves PAL and covers all non-physician related services and expenses. The PAL physicians and HMA own the stock of PHG.

(68) Defendant was greatly in favor of accepting the PAL proposal but plaintiff was not, due to a concern that the practice would suffer a loss of patient referrals from physicians, practices or groups not affiliated with PAL.

(69) Plaintiff declined to accept the PAL proposal and to affiliate with PAL.

(70) After plaintiff declined to affiliate with PAL, PAL pursued affiliation briefly with another Lancaster cardiology practice, Heart Specialists, and asked HMA to recruit a cardiologist from outside the Lancaster area.

(71) HMA began the process of recruiting cardiologists for PAL from outside the area in approximately December 2002.

(72) After his resignation in November 2002, defendant had discussions with PAL or HMA concerning a future association.

(73) Beginning on February 1, 2003, defendant opened a cardiology practice, Halbert Feinberg Cardiology and Critical Care, as an employee of HMA in order to guarantee him a source of income until he would receive insurance payments for medical services he performed.

(74) From February 1, 2003 until July 31, 2003, defendant was an employee of HMA pursuant to an employment agreement which contained, inter alia, a restrictive covenant.

(75) From February 1, 2003 until July 31, 2003, CPMG paid the operating expenses of defendant's practice in the amount of $348,442. (JX 28.)

(76) From February 1, 2003 until July 31, 2003, CPMG paid defendant a salary of $153,456 and a bonus of $60,361. (JX 28.)

(77) Beginning February 1, 2003, defendant began seeing patients referred by PAL physicians as well as his former patients who chose to transfer from plaintiff's practice to defendant's new practice. (JX 10.)

(78) Since opening his practice, defendant has declined to accept referrals from non-PAL physicians and has not solicited patient referrals from physicians or hospitals not affiliated with PAL.

(79) After opening his practice, defendant attempted to refer patients in need of cardiology services which defendant could not perform to plaintiff.

(80) Plaintiff refused to accept non-emergency referrals from defendant. (JX 23.)

(81) Since defendant opened his own practice, plaintiff's physicians have seen only one of defendant's patients, an electrophysiology patient, when plaintiff's physician was covering for other electrophysiologists who were either unavailable for medical reasons or out of town.

(82) Beginning August 1, 2003, defendant became an employee of PAL pursuant to an employment agreement which contained, inter alia, a restrictive covenant.

(83) Beginning August 1, 2003, the expenses of defendant's practice were paid through PHG and his compensation was paid by PAL.

(84) From August 1, 2003, through December 31, 2003, the operating expenses of defendant's practice in the amount of $202,403 were paid through PHG.

(85) From August 1, 2003 through December 31, 2003, defendant received $170,659 in total physician compensation from PAL including $155,024 in salary, and the remainder in fringe benefits, dues and memberships, travel, education and miscellaneous. (JX 28.)

(86) Defendant also received a bonus in the amount of $50,082 for 2003 which was paid in 2004.

(87) As a PAL physician, defendant was eligible to receive a bonus from an income pool divided among PAL physicians, family physicians as well as specialists.

(88) For the final quarter of 2003, the only period for which he was eligible to participate, defendant received a bonus of $7,500 from the income pool which was paid in 2004.

(89) When defendant discussed his future association with HMA and PAL, he informed both of the restrictive covenant in his employment agreement with plaintiff and was told that this matter was his problem.

(90) Defendant's employment by HMA occurred at approximately the same time HMA was in the final stages of recruiting a cardiologist from the Philadelphia area to come to Lancaster.

(91) An offer of employment was not made to the physician from the Philadelphia area by PAL because it was felt the physician's personality was not a match for the community.

(92) The restrictive covenant in the employment agreement between CPMG and defendant was not an impedi-

ment to defendant's employment by PAL in light of the relationship between CPMG and PAL.

(93) When defendant became an employee of CPMG and PAL, he did not consider himself in violation of the restrictive covenant in his employment agreement with plaintiff because, first, he did not view himself in competition with plaintiff, and, second, he believed he had been treated unfairly by plaintiff in that he was brought into the practice under one set of circumstances and was presented with a different set of circumstances in 1997.

(94) Defendant did not view himself in competition with plaintiff because plaintiff had chosen not to be the market for PAL referrals.

(95) The overhead expenses of plaintiff's practice are 60 percent of net revenue at the Lancaster Health Campus on an annual basis.

(96) In 2002, plaintiff had gross charges of $15,-104,857.89 and gross payments on these charges of $5,165,141.62. (JX 19, 29.)

(97) In 2002, his last year of employment by plaintiff, defendant had gross charges of $1,944,565.91 and gross payments on these charges of $848,234.99. (JX 29.)

(98) In 2003, plaintiff had gross charges of $13,-980,920.94 and gross payments on these charges of $4,515,758.28. (JX 19, 29.)

(99) Using the gross payments received on defendant's charges for 2002 and applying the overhead expense factor of 60 percent, plaintiff received $339,293 less net income in 2003 than in 2002.

(100) Defendant's total compensation for 2002 was $283,800. (JX 29.)

(101) PAL referrals to plaintiff in 2002 were 18,640 patients with total charges of $3,441,483.08 and total payments of $1,138,581.67. (JX 13.)

(102) PAL referrals to plaintiff in 2003 were 14,155 patients with total charges of $2,475,690.99 and total payments of $790,015.80. (JX 13.)

(103) In 2003, there were 4,485 fewer patient referrals to plaintiff by PAL physicians with the result that there was a difference of $965,792.81 in charges and $348,565.87 in payments between 2002 and 2003.

(104) Applying the overhead expense factor of 60 percent, plaintiff received $139,426 less net income from PAL referrals in 2003.

(105) Plaintiff's attorney's fees through trial are $52,330.50 with costs of $335.45 for a total of $52,665.95.

(106) Defendant's attorney's fees through trial are $41,957 with costs of $148.75 for a total of $42,105.75.

The court includes as findings of fact the factual determinations included in the discussion section of this memorandum.

## DISCUSSION

In this litigation, plaintiff maintains that defendant has breached the restrictive covenant in the 1997 professional employment agreement by engaging in the practice of cardiology in Lancaster County within two years of the termination of his employment. Although plaintiff has abandoned its claim for injunctive relief, it contends that it is entitled to monetary damages to compensate for the harm to its practice caused by defendant's conduct.

Defendant asserts that he is not bound by the terms of the restrictive covenant because of a lack of consideration and because his signature on the 1997 professional employment agreement was procured under duress. In the alternative, defendant posits that plaintiff has not been harmed by his actions and that the restrictive covenant should not be enforced because it is contrary to the needs of the community.

Section 11 of the 1997 professional employment agreement provides:

"(11) *Restrictive covenant.* In the event of the termination of the employment of employee for any reason, the employee hereby agrees that he shall not directly or indirectly, within the County of Lancaster, enter into or engage generally in competition with the employer or any of its shareholders in the business of the practice of cardiology and/or internal medicine either as an individual on his own, or as a partner or joint venturer, or as an employee or agent of any person, partnership, or corporation, or as an officer, director, or shareholder or otherwise for a period of two (2) years after the date of termination. This covenant on the part of the employee shall be construed as an agreement independent of any other provision of this agreement, and the existence of any claim or cause of action of the employee against the employer, whether predicated upon this agreement or otherwise, shall not constitute a defense to the enforcement by the employer of the covenant."

For a restrictive covenant to be enforceable in an employment context, three criteria must be satisfied. The restrictive covenant must (1) relate to (be ancillary to) a

contract for the sale of the good will of a business or to a contract of employment, (2) be supported by adequate consideration, and (3) be reasonably limited in both time and territory. *Piercing Pagoda Inc. v. Hoffner,* 465 Pa. 500, 351 A.2d 207 (1976); *George W. Kistler Inc. v. O'Brien,* 464 Pa. 475, 347 A.2d 311 (1975); *Bilec v. Auburn & Associates Inc. Pension Trust,* 403 Pa. Super. 176, 588 A.2d 538 (1991). Although close judicial scrutiny is warranted in cases of restrictive covenants involving physicians due to the importance of medical services to the community, such covenants may nevertheless be enforced in appropriate circumstances. *New Castle Orthopedic Associates v. Burns,* 481 Pa. 460, 392 A.2d 1383 (1978); *West Penn Specialty MSO Inc. v. Nolan,* 737 A.2d 295 (Pa. Super. 1999).

When a covenant not to compete is signed subsequent to employment, it must be supported by new consideration. *George W. Kistler Inc. v. O'Brien,* 464 Pa. 475, 347 A.2d 311 (1975); *Maintenance Specialties Inc. v. Gottus,* 455 Pa. 327, 314 A.2d 279 (1974). Such new consideration could be in the form of a corresponding benefit to the employee or a beneficial change in his employment status. *Davis & Warde Inc. v. Tripodi,* 420 Pa. Super. 450, 616 A.2d 1384 (1992); *Ruffing v. 84 Lumber Company,* 410 Pa. Super. 459, 600 A.2d 545 (1991); *Modern Laundry & Dry Cleaning Co. v. Farrer,* 370 Pa. Super. 288, 536 A.2d 409 (1988).

A covenant not to compete is breached if the employee knowingly engages in activity, the necessary effect of which will be to foster, if not instigate, competition. *Aiken Industries Inc. v. Estate of Wilson,* 477 Pa. 34, 383 A.2d 808 (1978).

In light of the issues raised by the parties, it is appropriate to determine first if the restrictive covenant is enforceable. Only if this question is answered in the affirmative will it be necessary to decide if defendant breached the restrictive covenant and what should be the economic consequences of such conduct.

Defendant argues that the restrictive covenant is unenforceable due to lack of consideration and because the agreement containing this covenant was signed under duress. The court will address this latter issue first.

Duress is an affirmative defense, Pa.R.C.P. 1030(a), on which defendant bears the burden of proof. *Beato v. DiPilato,* 175 Pa. Super. 602, 106 A.2d 641 (1954).

The record reflects that defendant first saw the revised 1997 professional employment agreement on the day in April or May 1997, when it was presented to him for signature. This occurred at plaintiff's office where defendant was working. Plaintiff's practice administrator, Gary Holsopple, informed defendant that the practice had been unable to bill for defendant's services in 1997 due to the lack of an employment contract. Mr. Holsopple also indicated that, if the agreement was not signed, defendant would not receive his next scheduled paycheck. There is no evidence that Mr. Holsopple hindered defendant from leaving the area where they were talking or otherwise prevented him from reading the agreement. Defendant had previously consulted with legal counsel with respect to the initial 1997 professional employment agreement, and this option remained available to him.

Defendant's employment contract with plaintiff expired December 31, 1996. (JX 1.) The parties, however, continued defendant's employment conditions un-

changed at least for a period of time. Defendant had made it clear that he would not sign the initial professional employment agreement with its severance pay provision or the joinder to shareholder's agreement. It is apparent, therefore, that a fundamental change not previously contemplated by either side would occur in the parties' relationship.

Defendant does not dispute plaintiff's assertion that it was unable to properly bill for his services in the absence of a signed employment agreement, thus imposing on plaintiff the burden to clarify his employment status. Further, there is no evidence defendant complained that he had been coerced into signing the professional employment agreement in the six years between its execution and the commencement of this litigation, or that he took any steps to remedy this perceived wrong.

Accordingly, the court concludes that defendant has failed to establish that he signed the revised 1997 professional employment agreement under circumstances constituting duress. See *Degenhardt v. Dillon Company,* 543 Pa. 146, 669 A.2d 946 (1996).

The claim that the restrictive covenant in the revised 1997 professional employment agreement is unenforceable for lack of consideration presents a more substantial concern.

Although Pennsylvania law permits the enforcement of restrictive covenants, they are not favored and have been viewed historically as a trade restraint that prevents a former employee from earning a living. *Hess v. Gebhard & Co. Inc.,* 570 Pa. 148, 808 A.2d 912 (2002).

Defendant had signed four successive employment agreements, each of which contained a restrictive cov-

enant. This case, therefore, does not fit squarely within the precedents in which a written contract with a restrictive covenant is introduced for the first time after a period of employment without any reference to such a provision. However, defendant had been employed from January 1997 through April or May of that year without a contract with such a covenant. As such, he cannot be considered a new employee for whom an initial contract of employment may satisfy the requirement of adequate consideration. Moreover, defendant's refusal to accept shareholder status or to execute the 1997 professional employment agreement offered to and accepted by Dr. Lesko presaged a significant change in the relationship between plaintiff and defendant. Mr. Holsopple testified that there had been discussion among the physician shareholders as to what the consequences would be if defendant did not sign a new employment agreement. If defendant did not become a shareholder or sign an employment agreement, a decision would have to be made whether defendant would continue to be employed.

Viewing these circumstances in light of the legal principles cited above, the court concludes that defendant is appropriately viewed as a current employee asked to assume a contract containing a restrictive covenant. Unlike more mundane terms of employment,[1] a restrictive covenant is disfavored in law and, therefore, is to be viewed as sui generis. Accordingly, for such a covenant to be enforceable in this case, it must be supported by new consideration, *i.e.,* a corresponding benefit to de-

---

1. The language of the restrictive covenant indicates that the parties viewed this provision as distinct from the other terms of the agreement. (JX 3, 30, ¶11.)

fendant or a beneficial change in his employment status upon execution of the revised 1997 professional employment agreement.

The record fails to disclose any benefit to defendant which would be adequate to constitute new consideration. The revised 1997 professional employment agreement was simply plaintiff's standard professional employment agreement with certain deletions. The formula for calculating defendant's compensation and his fringe benefits were unaffected. However, the agreement would have a negative financial impact upon defendant.

Although the provision for severance pay had been eliminated from his agreement, defendant was required to pay for this provision since severance payments to departing physicians were treated as an expense of the practice and deducted from gross receipts. Since plaintiff's overhead was fairly consistent, the payment of a severance benefit would increase the expenses of the practice and thereby reduce the net receipts upon which the compensation of defendant as well as the remaining physicians was calculated. Even though he chose voluntarily not to participate, the introduction of the severance pay plan was a corresponding detriment, not a benefit, to defendant.

The professional employment agreement also contained a provision that an employee who had completed more than 10 years of employment with plaintiff could not be terminated without cause. (JX 3, 30, ¶10(a)(i).) This clause would not become effective until six years after the effective date of defendant's 1997 professional employment agreement, and plaintiff retained the right on a yearly basis to terminate his employment without

cause prior to that point. Defendant's prior employment contracts were each for a term of one year. Since plaintiff retained the right to terminate him without cause until he had been employed for more than 10 years, defendant's 1997 professional employment agreement was in effect a series of six one-year contracts. The possibility of a future limit on plaintiff's ability to terminate defendant's employment without cause does not constitute consideration for the restrictive covenant in issue.

Plaintiff argues that adequate consideration for the restrictive covenant may be found in defendant's refusal to accept shareholder status since this relieved him of the liabilities and responsibilities inherent in an ownership interest in the practice. This purported consideration is illusory. Defendant was not relieved of any liabilities and responsibilities for the obligations of the practice since, as a mere employee of the professional corporation, he never had or assumed any. The result would be different if defendant had been a shareholder and the remaining shareholders agreed as part of his employment agreement to assume his share of the practice's obligations.

For the reasons stated above, the court concludes that the restrictive covenant in defendant's 1997 professional employment agreement is unenforceable due to lack of new consideration. Having reached this conclusion, the court need not determine whether defendant has breached the restrictive covenant and, if so, the monetary damages to which plaintiff would be entitled. Any discussion of these matters would amount to only an ill advised and unwarranted advisory opinion.

Finally, as the prevailing party, defendant is entitled to an award of attorney's fees and costs. (JX 3, ¶12.)

Consistent with the foregoing, the court makes the following conclusions of law.

## CONCLUSIONS OF LAW

(1) The court has jurisdiction over the parties and the subject matter of this dispute.

(2) Plaintiff and defendant entered into a professional employment agreement in April or May 1997, which contained a restrictive covenant. (JX 3.)

(3) The restrictive covenant in the 1997 professional employment agreement was not supported by new consideration, *i.e.,* a corresponding benefit to defendant or a beneficial change in defendant's employment status.

(4) The restrictive covenant in the 1997 professional employment agreement is unenforceable.

(5) Plaintiff has abandoned its claim for injunctive relief.

(6) Defendant has abandoned his counterclaim.

(7) Plaintiff is not entitled to an award of monetary damages since the basis for its claim, the restrictive covenant, is unenforceable.

(8) Defendant is the prevailing party in this litigation and is entitled to recover reasonable attorney's fees and costs.

For the reasons stated herein, the court enters the following:

## ORDER

And now, October 22, 2004, the court orders a verdict in favor of defendant Halbert J. Feinberg M.D., and

against plaintiff, Cardiac Consultants P.C., on plaintiff's complaint.

Defendant, Halbert J. Feinberg M.D., is awarded attorney's fees and costs in the amount of $42,105.75 to be paid by plaintiff, Cardiac Consultants P.C.